# EXHIBIT A



**CORPORATION SERVICE COMPANY**

# Notice of Service of Process

**null / ALL**
**Transmittal Number: 14754433**
**Date Processed: 02/04/2016**

| | |
|---|---|
| Primary Contact: | Phil Italiano<br>New Penn Financial, LLC<br>4000 Chemical Rd<br>Suite 200<br>Plymouth Meeting, PA 19462-1708 |
| Copy of transmittal only provided to: | Justin Bradley<br>Jeffrey Cronin<br>Luke Umstetter<br>Shannon Leight |

| | |
|---|---|
| Entity: | New Penn Financial, LLC<br>Entity ID Number 3474104 |
| Entity Served: | New Penn Financial LLC dba Shellpoint Mortgage Servicing |
| Title of Action: | Orville Cain vs. The Bank of New York Mellon fka the Bank of New York |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Contract |
| Court/Agency: | Loudoun County Circuit Court, Virginia |
| Case/Reference No: | 107CL00099182-00 |
| Jurisdiction Served: | Virginia |
| Date Served on CSC: | 02/04/2016 |
| Answer or Appearance Due: | 21 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Christopher E. Brown<br>703-924-0223 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

*serve*

# COMMONWEALTH OF VIRGINIA



### LOUDOUN CIRCUIT COURT
Civil Division
18 E MARKET ST/PO BOX 550
LEESBURG VA 20178-0550
(703) 777-0270

Summons

To: NEW PENN FINANCIAL LLC
DBA SHELLPOINT MORTGAGE SERVIC
SERVE: CORPORATION SERVICE CO
1111 EAST MAIN STREET
RICHMOND VA 23219

Case No. 107CL00099182-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on Thursday, January 21, 2016

Clerk of Court: GARY M CLEMENS

by _____K Wauer_____
(CLERK/DEPUTY CLERK )

Instructions:

Hearing Official:

Attorney's name:    DELEONARDIS, ROCCO
11480 SUNSET HILLS RD STE 120E
703-883-2020
RESTON VA 20190

VIRGINIA:

IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

ORVILLE CAIN
18392 Fairway Oaks Square
Leesburg, VA 20176

        Plaintiff,

    v.

                                     Civil Action No.  CL 09182

THE BANK OF NEW YORK MELLON FKA
THE BANK OF NEW YORK,
101 Barclay St – 4W
New York, NY 10286
SERVE: Private Process

New Penn Financial, LLC
DBA Shellpoint Mortgage Servicing
Serve Registered Agent:
Corporation Service Company
1111 East Main Street
Richmond, Virginia 23219

Resurgent Capital Services, LP
Serve Registered Agent:
Corporation Service Company
1111 East Main Street
Richmond, VA 23219

FFC PROPERTIES, LLC
Serve: Brian Fowler
17090 Quail Creek Circle
Hamilton, VA 20158

SAMUEL I. WHITE, P.C.
5040 Corporate Woods Blvd, Suite 120
Virginia Beach, VA 23462

        Defendants.

## COMPLAINT

    NOW COMES, the Plaintiff, Orville Cain (hereinafter he may be referred to as "Plaintiff"),

by and through counsel, and for her Complaint states as follows:

## PARTIES

1.     Plaintiff, Orville Cain, is a resident of Virginia, and was the lawful title holder of 18392 Fairway Oaks Square, Leesburg, VA 20176 (hereinafter, the "Property") prior to the foreclosure held on February 26, 2015, subject to a Deed of Trust dated December 29, 2206.

2.     Defendant Bank of New York Mellon, fka the Bank of New York ("BNYM"), is, allegedly, trustee for the Certificate holders of the CWALT, Inc., Alternative Loan Trust 2007-OA8, Mortgage Pass Through Certificates, Series 2007-OA8 ("CWALT 2007-OA8"). Upon information and belief, CWALT, Inc, ALT 2007-OA8 is not licensed to transact business in the Commonwealth and is unlawfully attempting to enforce a contract it has no right to enforce the subject Deed of Trust.

3.     Upon information and belief, Resurgent Capital Services, LP ("Resurgent") is a Delaware Limited Partnership.

4.     Upon information and belief New Penn Financial, LLC is a Delaware LLC and trading as Shellpoint Mortgage Servicing ("Shellpoint") in Virginia.

5.     Upon information and belief, FFC Properties, LLC ("FFC Properties") is a Virginia Limited Liability Company.

6.     Defendant Samuel I. White, P.C. ("Sam White") regularly transacts business in the Commonwealth as trustee to deeds of trust and conducts foreclosures. Sam White is the unlawfully appointed substitute trustee to Plaintiff's Deed of Trust.

## JURISDICTION AND VENUE

7.     The Court may exercise personal jurisdiction over Defendants in the action because they transacted business, including the transactions at issue in the present matter, within the Commonwealth of Virginia.

8.     Venue is appropriate in the Court pursuant to Virginia code 8.01-261(3)(b) because the suit concerns real property located in Loudoun County, Virginia.

## NATURE OF THIS CASE

9.     This case was is one of a dwindling number of cases originated during the mortgage boom of 2000-2008 which was subject to scrutiny of the US Department of Justice because of Bank of America's history of corruption. This particular loan was originated by Premier Lending, then sold to Countrywide Home Loans, one of the first and largest residential mortgage banking failures to occur during the bank collapse in October 2008. Bank of America acquired and assumed liability for the Countrywide loans, including the subject loan. The loan was then allegedly transferred via an invalid robo-signed MERS assignment purporting to transferring interest to Bank of New York Mellon as trustee for a securitized trust.

10.     The Court can take judicial notice that Bank of America was a defendant in a $25 billion dollar judgment by the U.S. Depart of Justice in the highly publicized "National Settlement" where five of the nation's largest banks, including Bank of America, were fined for their unlawful foreclosure practices. In the aftermath of the latest mortgage boom between 200-2008, the nations largest banks have been subject of extensive scrutiny because of the way the servicers foreclosed on homeowners for loans which were fraudulently and/or insufficiently documented. The nature of the Fraud can be found in the Consent Order for $25 Billion dollars, excepts of which are attached as Exhibit A.

11.     The subject loan falls squarely in the time period and by the same defendant, Bank of America, which was fined so heavily for the unlawful foreclosure practices on securitized loans without proper paperwork. Bank of America has transferred the same paperwork to these

3

defendants who are now attempting to foreclose on deeds of trusts which have fraudulently transferred to inactive securitized and by parties who don't have legal authority to foreclose.

12.     The subject loan has been transferred via a robo-signed MERS assignment, against MERS own published policy, to a securitized trust which was inactive, and foreclosed on by a third party substitute trustee nominated by an interim servicer, Resurgent, which became the Servicer for a short period of time simply to appoint Sam White as Trustee. Once Resurgent appointed Sam White, Resurgent transferred the servicing rights to ShellPoint which ultimately authorized a foreclosure.

13.     The daisy chain of "Lenders" and "Servicers" of these fraudulent and insufficiently loan documents is a bad faith attempt to separate the present defendants from the illegal acts of Bank of America and Resurgent.

14.     This Court should be able to plainly see how these group of defendants are working together to foreclosure on residential properties in Virginia using the same unfair and deceptive foreclosure practices and deficient paperwork which resulted in criminal investigations and judgment against the Nation's largest Banks, including Bank of America, the original Servicer of the subject loan.

## FACTS

15.     On December 29, 2006, Plaintiff entered into a consumer financial transaction for the Property.

16.     As part of the transaction Plaintiff executed a Deed of Trust (**Exhibit B**) which named Premier Mortgage Company, LLC ("Premier") as Lender.

17.     Despite executing the Deed of Trust, the Plaintiff did not execute a promissory note related to the Deed of Trust. See the Promissory Note attached as **Exhibit C.**

4

18.    Plaintiff was the co-owner of the Property, as evidenced by a Deed recorded among the land records of Loudoun County.

19.    In order for the borrower, Inez Cain, to qualify for the loan, the lender, Premier, used the income generated by the Plaintiff's company, CMC Development Group, Inc.

20.    After the financial meltdown in 2008, the Plaintiff had to close his business and worked in a related field as a data analysist.

21.    After several attempts to do a loan modification, which were all turned down by the then investor and servicer, the Plaintiff engaged a law firm to assist him in obtaining a loan modification.

22.    Despite using his company's income to qualify for the original loan, the Plaintiff was told by Shellpoint that he could not modify the loan because he was not the borrower.

23.    Their lender / servicer refused to help him, and the Plaintiff began receiving demands for payment and notice of foreclosure from CWALT 2007-OA8 through SAM WHITE.

24.    On or about February 26, 2015, SAM WHITE conducted a foreclosure sale on the Property.

### UNAUTHORIZED SUBSTITUTION OF TRUSTEE

25.    The foreclosure sale was conducted by SAM WHITE pursuant to documents among the land records filed on September 13, 20111 by Resurgent, an interim servicer, which appointed SAM WHITE as the substitute trustee to the Deed of Trust.

26.    After the Assignment was recorded Resurgent conveniently passed the servicing rights to defendant, Shellpoint.

27.    Resurgent had absolutely no other contact with the Plaintiff or the borrower and, upon information and belief, its sole function was to appoint Sam White as substitute trustee.

28.      Resurgent has no authority to appoint a substitute trustee as they do not have any purported interest in the Deed of Trust and has provided no documentation authenticating its authority. Neither the Plaintiff nor the borrower received any notice that Resurgent was going to be the servicer of the loan. In fact, Resurgent preformed no servicing of the loan except to appoint Sam White. See Appointment of Substitute Trustee attached as Exhibit D.

29.      Resurgent simply claimed to be an attorney in fact for an entity appointed by MERS in violation of MERS own policy, and without any other showing of a power of attorney to appoint Sam White as substitute trustee.

30.      The Deed of Trust at ¶24 has explicit terms – the Lender may appoint a substitute trustee. At ¶16(c) the Deed of Trust states the word "may" means gives sole discretion to act. Thus, in abiding by the plain language of the contract, only the Lender, or its lawful successor, may appoint a substitute trustee.

31.      Resurgent appointed SAM WHITE as the substitute trustee in a document that Plaintiff did not receive, although the law requires he be sent a copy (See VA Code §55-59.1(A)).

32.      The document appointing SAM WHITE as substitute trustee was created and recorded by SAM WHITE and executed by Resurgent and is a self-serving document without proper authority under Virginia law.

33.      The Deed of Trust has conditions precedent, and those conditions precedent must be satisfied or the remedy of foreclosure does not accrue.

34.      As SAM WHITE was unlawfully appointed by a party with no authority to so act, SAM WHITE had nothing to sell at the foreclosure sale, thus the sale is void.

35.      Resurgent and SAM WHITE had no authority to so act, as neither were the Lender, nor the successor in interest to the Lender, and per the plain terms of the contract, that is the only

6

entity that may take such action – the party secured by the deed of trust (the owner of the loan may foreclose to recover losses resulting from the default).

36.     The Lender is identified on the contract itself.  In the absence of valid evidence the loan / note was transferred to Bank of New York (thus followed by the Deed of Trust), CWALT 2007-OA8, and that the servicing rights were transferred from Bank of America to Resurgent Capital Servicing, LLC, the current alleged "Lender" and "Servicer,  may not enforce a contract its name is not on.

## THE MERS ASSIGNMENT OF THE DEED OF TRUST IS VOID

37.     The Deed of Trust further states at ¶22 that the Lender, or its lawful successor, may accelerate the debt (a condition precedent to foreclosure) and invoke the power of sale (a condition precedent to foreclosure).

38.     The document among the land records which purports to assign the Cain loan to CWALT 2007-OA8: it is dated September 13, 2011, and purports to assign the Deed of Trust together with the note (**Exhibit E**).

39.     Mortgage Electronic Registration Systems, Inc. ("MERS") has repeatedly stated that its assignments do not transfer any interest in the loan / note.  **Exhibit F** – MERS Answer; **Exhibit G** – Transcript of MERs stating its assignments do not transfer the loan).

40.     Further, at the time the Deed of Trust was allegedly transferred to CAWLT 2007-OA* by MERS, CAWLT 2007-OA* was inactive and was incapable of taking action on the Deed of Trust.

41.     This is further evidenced by MERS rules and procedures, which make clear that the Lender or Servicer (agent of CAWLT 1007-OA8) is to prepare and have its employee execute the assignment – MERS has nothing to do with the document, is not aware of the document, revealing

7

it is nothing more than a self-serving statement to be given no weight (**Exhibit H** – MERS Rules; **Exhibit I** – MERS Rules details; **Ex J** – MERS Procedures).

42.     The MERS Assignment was prepared, executed, and recorded by SAM WHITE and Resurgent – **_not_** by the **_assignor_** of the interest.

43.     The MERS Assignment further states MERS is the holder of the Deed of Trust – despite MERS is never to be identified as the holder of the security instrument as made clear to the mortgage industry in a Fannie Mae announcement (**Exhibit K** – Fannie Mae MERS foreclosure process announcement, dated 12.7.2006)(Fannie Mae is one of the major creators of MERS).

44.     The "successor to the Lender" is one who "purchases the note," the DoT at ¶10, which states that mortgage insurance reimburses the Lender (or an entity that purchases the note) for certain losses that may incur (also see "Definitions ¶O").[1]

45.     CWALT 2007-OA8 submitted sworn filings to the SEC. Said filings reveal that the trust is required to engage in a true sale and take possession of the loan / mortgage file by its closing date in 2005. As part of said mortgage file the custodian of the trust will have the original note with all intervening endorsements and all intervening assignments reflecting the Loan was sold through various entities into the trust. See **Exhibit L** – Pooling and Servicing Agreement, relevant sections).[2]

---

[1] *Accord* VA. CODE §8.9A-102(a)(72)(D) ("Secured Party" means a person to which ... promissory notes have been sold).
[2] The CWALT 2007-OA8 SEC filings care incorporated herein by reference, and can be found at: http://www.sec.gov/cgi-bin/browse-edgar?company=2007-OA8&match=contains&filenum=&State=&Country=&SIC=&myowner=exclude&action=getcompany

46.     The Pooling & Servicing Agreement can be found on the SEC website, and the Court can take judicial notice thereof, as well as the entirety of the CWALT 2007-OA8 SEC filings.[3]

47.     The Pooling & Servicing Agreement makes clear that each Seller (Loan originator) is to sell the loans to the Depositor – CWALT, INC, which in turn sells the loans to the trustee. (*See* Ex L.)

48.     In connection with the transfer and assignment of the loans the Depositor will deliver to the Trustee the original mortgage note, endorsed *in the following form*: "Pay to the order of _____, without recourse," with all necessary intervening endorsements (eg. originator to depositor, to trustee). *See* Ex L.

49.     Thus, the endorsements on the original Note, were the Defendant CALT 2007-OA8 able to produce it, *must* have endorsements from Bank of America → CWALT → The Bank of New York, as trustee for CWALT 2007-OA8 or in blank. *See* Ex J.

50.     Per the Pooling & Servicing Agreement, the closing date for the trust was June 28, 2007 – thus it was to engage in a true sale / purchase of the assets in the trust by that date, and have the original note properly endorsed with all intervening endorsements, and a proper assignment and all intervening assignments by the closing date – thus all assignments must *pre-date* June 28, 2007.

51.     CWALT 2007-OA8 does not have the original note with the required endorsements (See ¶¶34-36).

---

[3] P&S Agreement: http://www.sec.gov/Archives/edgar/data/1399511/000090514807004941/efc7-1883_ex41.htm

52.     The failure of CWALT 2007-OA8 to produce any of the required documentation to support its assertion that it owns the loan reveals it is not the owner of the loan and has no interest therein, nor has it ever, and it cannot "hold" the original promissory note as holding the note after the closing would jeopardize the status of the trust (agents of the trust may not take any action that would cause the REMIC to fail, i.e. lose its tax exempt status per New York Trust Law which governs all actions taken by CWALT 2007-OA8.

53.     Were Defendant CWALT 2007-OA8 to claim otherwise would be to admit that CWALT 2007-OA8 has submitted a false statement to the federal government in a sworn document - its SEC filings, and that it has failed to satisfy the requirements of the SEC and IRS rules and regulations (which it swore it did satisfy, entitling it to tax exempt REMIC status), thus would not be entitled to tax exempt status, thus owes taxes for the several transactions engaged in to move the pool of loans into the REMIC, and on all income generated by the loans in the pool (payments), and on all insurance policies and credit default swaps resulting in payment to the REMIC.

54.     Actions of the various trust entities that are not in compliance with its legal requirements are void – legally meaningless as the trust entities may not legally act outside of the constraints of the SEC filings and New York law (See EPTL §7-2.4).

55.     CWALT 2007-OA8 is a common law trust, governed by the laws of New York (See Ex D, Section 10.03), and is a legal entity that speaks only through its agents, each of whom is strictly limited to acting only as allowed under the trust's SEC filings.

56.     CWALT 2007-OA8 acquires mortgages, pools them and then issues securities secured or backed by the mortgages it holds. The investors receive interest or principle, or both, from the mortgages assigned to those specific securities or obligations.

10

57.    The manner in which the trust acquires the mortgages, issues the securities and pays the income from the mortgages to investors, is governed by the trust's pooling and servicing agreement (PSA).

58.    CWALT 2007-OA8 is organized as a Real Estate Mortgage Investment Conduit (REMIC). As a REMIC, the trust's investors receive significant tax benefits, but to receive those benefits, the trust must comply with the US Treasury regulations governing REMICS. 26 USCA §860-D-1.

59.    The terms of the PSA require that the trust agents do not operate or take any action that would jeopardize its REMIC status.

60.    The closing date is designated as the "start up day" of each REMIC. Pursuant to 26 USCA §860-G-(b)(9), the "start up day" of a REMIC is the day upon which the REMIC issues all of its regular and residual interests.

61.    The PSA specifically requires the Depositor to have transferred all of the interest in the mortgage notes to the Trustee on behalf of the trust as of the closing date.

62.    The [purported] transfer of the Cain Loan is void because interest in the Deed of Trust was acquired after the closing date in violation of the terms of the PSA.

63.    *Mere recital* of assignment, holding or receipt of an asset (which is all CWALT 2007-OA8 is capable of doing given it cannot produce the required documents it swore it would have to evidence a true sale by the closing date) is insufficient to transfer an asset to a trust. The grantor must actually transfer the asset. EPTL §7-1.18.

64.    The requirement that the grantor must actually transfer the asset – and have documentary evidence to prove it was done by the closing date - is required to avoid the self-

11

serving assertions that will be made by CWALT 2007-OA8 in an attempt to avoid liability for the below claims.

65. The assignment of the mortgage which the defendants are using to foreclose was dated in 2011, however, pursuant to the terms of the PSA the trust closed in 2007.

66. Thus the trustee [purportedly] acquired the subject note and mortgage after the closing date, the trustee's act in acquiring them exceeded its authority and violated the terms of the trust.

67. The acquisition of a mortgage after 90 days is not a mere technicality but a material violation of the trust's terms, which jeopardizes the trust's REMIC status.

68. Since the trust was organized as a REMIC, the investors received certain tax benefits on the income that passed through the trust to them. Section 26 U.S.C.A. § 860D(a)(4) defines a REMIC as an entity that as of the close of the 3rd month beginning after the startup day and at all times thereafter, substantially all of the assets of which consist of qualified mortgages and permitted investments.

69. Section 26 U.S.C.A. § 860G (a)(3)(i,ii) defines a qualified mortgage as (A) any obligation (including any participation or certificate of beneficial ownership therein) which is principally secured by an interest in real property and which (I) is transferred to the REMIC on the startup day in exchange for regular or residual interests in the REMIC, (ii) is purchased by the REMIC within the 3-month period beginning on the startup day if, except as provided in regulations, such purchase is pursuant to a fixed-price contract in effect on the startup day.

70. Thus to qualify for the REMIC tax benefits, the mortgages upon which the securities are based must be acquired by the Trust within three months of its startup date.

71.   Under New York Trust Law, every sale, conveyance or other act of the trustee in contravention of the trust is void. EPTL §7-2.4. Therefore, the acceptance of the note and mortgage by the trustee after the date the trust closed, would be void.

72.   The "Mortgage Loan Purchase Agreement" requires that the Depositor deliver and deposit with the Trustee the original note endorsed in blank with all intervening endorsements, the original mortgage and an original assignment with all intervening assignments. The Trustee is then obligated to provide to the Depositor an acknowledgment of receipt of the assets before the closing date.

73.   The assignment of the note and mortgage from MERS as nominee for the original lender rather than from the Depositor violates section the Mortgage Loan Sale Agreement which requires that the Depositor purchase the loans from the Seller, then deliver to and deposit the original note, mortgage and assignments to the Trustee by the closing date.

74.   The assignment of the note and mortgage, having not been assigned from the Depositor to the Trust, is therefore void as in being in contravention of the PSA.

**The Foreclosure Sale is Void.**

75.   The Defendants have not satisfied all the conditions precedent to foreclose on the subject property and, pursuant to Virginia law, Matthews v PHH, the foreclosure sale which took place on February, 2015 is void.

### COUNT I
### Breach of Contract
(All Defendants)

76.   The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-75 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiffs.

13

77.     The Deed of Trust is the standardized contract generated by the Department of House and Urban Development (HUD) which outlines the terms and conditions between the borrower (Plaintiff), the Lender, the Trustee, and the Servicer and used by the major banks in the same or similar form as all other standard deeds of trust issued by HUD generated from 2000-2008.

78.     To the extent that the Defendants are actually the Lender, Servicer, and Foreclosure Trustee they must abide by the terms of the Deed of Trust.

79.     The Deed of Trust defines "*Applicable law*" as: "**all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final non-appealable judicial opinions.**" This definition of Applicable Law is one of the broadest possible definitions of applicable law possible and applies to this standardized HUD Deed of Trust and just about every residential deed of trust generated between the year 2000-2008.

80.     The term "Applicable Law" is used extensively in the Deed of Trust. For example, paragraph 16 of the Deed of Trust says, "16. Governing Law; Severability; Rules of Constructions. This security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of *Applicable Law*..."

81.     Paragraph 20 of the Deed of Trust imposes a duty on Lenders, Loan Servicers and Borrowers to follow *Applicable Law*.

82.     Paragraph 22, 23, and 24 of the Deed of Trust under the heading "NON-UNIFORM COVENANTS....Acceleration; Remedies," are the final three paragraphs of the Deed of Trust and the primary sections of the Deed of Trust related to the remedy of foreclosure. These paragraphs

14

reference "*Applicable Law*" six (6) times as it relates to the restrictions of the Lender and Substitute Trustee to foreclose on the Property.

83.     The Deed of Trust only allows the proper Lender, or the proper successor to the Lender initiate foreclosure on the Property, and the proper Trustee to conduct a foreclosure on the Property.

84.     Paragraph 22 of the Deed of Trust which says "Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement to this Security Instrument……. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale…."

85.     None of the Defendants informed the Borrower of her right to bring a court action to assert the non-existence of a default or any other of Borrower's defense to acceleration and sale.

86.     The documents on the public record show that Resurgent Capital Services, LLC invoked the power of sale provision in the Deed of Trust and then disappeared. Resurgent does not have over 50% interest in the monetary obligation secured by the Deed of Trust. Virginia Code § 55–59(9) states:

> "The party secured by the deed of trust, or the holders of greater than fifty percent of the monetary obligations secured thereby, shall have the right and power to appoint a substitute trustee or trustees. The instrument of appointment shall be recorded in the office of the clerk wherein the original deed of trust is recorded prior to or at the time of recordation of any instrument in which a power, right, authority or duty conferred by the original deed of trust is exercised."

87.     Although Virginia is a non-judicial state, it has strict statutes related to who can invoke the power of sale in a deed of trust. Logically, not just anyone can enforce a deed of trust. Virginia code does not even allow parties with a bona fide interest in a deed of trust to foreclose unless they have greater than fifty percent (50%) interest in the security instrument.

15

88.     The Defendants, by their combined actions working in concert with each other violated Virginia Code § 55–59(9) because neither Bank of New York Mellon, Resurgent, Shellppoint have over 50% interest in the Deed of Trust.

89.     The Defendants violated of Virginia Code **Code §55-119** . because the Corporate Assignments and Appointment of Substitute Trustee were not executed by an individual with the requisite legal capacity as imposed by Virginia Code §55-119. Virginia Code §55-119 reads in pertinent part:

> Deeds of corporations; how to be executed and acknowledged: "All deeds made by corporations shall be signed in the name of the corporation by the president or acting president, or any vice-president, or by such other person as may be authorized thereunto by the board of directors of such corporation, and, if such deed is to be recorded, the person signing the name of the corporation shall acknowledge the same in the manner provided by § 55-120.".

90.     Virginia does not allow just anyone to execute a document on behalf of a corporation, let alone a large financial institution such as Bank of New York Mellon, and record it in the public records. Virginia Code §55-119 requires that any such document "shall be signed in the name of the corporation by the president or acting president, or any vice-president, or by such other person as may be authorized thereunto by the board of directors of such corporation" (emphasis added).

91.     None of the individuals who executed the Corporate Assignments or Appointments of Substitute Trustee have the requisite statutory authority or corporate capacity to execute the documents they filed on the public records.

92.     These documents are required by Virginia statute to be signed by the legally authorized representative of the party with over 50% interest in the security instrument. The people

16

who signed the documents filed on the public record did not have the requisite corporate authority based on the documents themselves to execute the documents on behalf of the entities they were supposed to have represented, nor did the entity have the requisite 50% interest.

93.     The Defendants breached the Deed of Trust by violating "Applicable Law" by their respective participation in the preparation, execution, and recordation of the Corporate Assignments and Appointment of Substitute Trustee.

**Violation of other Applicable Law**

94.     In additional to applicable Virginia statute and case law, the body of law comprising "Applicable Law" as defined under the Deed of Trust includes just about all conceivable state and federal law, both statute and case law, governing the purchase and financing of residential real estate, including the Virginia Code, all Virginia case law related to foreclosures, federal statutes relating to debt collection such as the Fair Debt Collections Practices ACT ("FDCPA"), Equal Credit Opportunity Act ("ECOA"), all Applicable Law related to Real Estate Mortgage Insurance Conduits ("REMIC") under the laws of the state of New York where the subject Trust was formed, Federal and State "Applicable" non-appealable opinions of Courts in Virginia, New York, and other jurisdictions which govern any issues of this case and any other federal, as well as acts of the U.S. Department of Treasury directives in the Emergency Economic Stabilization Act of 2008 (EESA), The Troubled Asset Relief Program (TARP), The Making Home Affordable (MHA) Program, Home Affordable Modification Program (HAMP), .The Home Price Decline Protection Incentives (HPDP) initiative. The Principal Reduction Alternative (PRA), The Home Affordable Unemployment Program (UP), The Home Affordable Foreclosure Alternatives Program (HAFA). The Second Lien Modification Program (2MP under HAMP), The FHA-HAMP Program, The Treasury/FHA Second-Lien Program (FHA2LP), The FHA Refinance for Borrowers with

17

Negative Equity (FHA Short Refinance) Program, Housing Finance Agency Hardest Hit Fund (HHF), the Pooling and Servicing Agreement ("PS Agreement"), which governs the actions of New York Mellon Bank, Resurgent, Shellpoint and Bank of America under the subject securitized Trust.

95. All the Defendants working together played their role in foreclosing on the Property in breach of the Deed of Trust and Applicable Law.

96. The Defendants played their respective role in breaching the Deed of Trust and all Applicable Law related to the subject loan and Deed of Trust including, but not limited to, foreclosing on the subject Deed of Trust despite having the requisite authority, using the Plaintiff's income to qualify the borrower for the underlying loan but refusing to use the Plaintiff's income to consider a loan modification, concealing the true nature of the party initiating foreclosure, dual tracking and employing other bad faith and deceptive acts and practices and by not offering the Plaintiff a viable alternative to foreclosure, all in violation of Applicable law.

97. As a direct and proximate result of the Breach of the Deed of Trust and violation of Applicable Law the Plaintiffs have been damaged by being deprived of the quiet enjoyment of the Property, being required to pay legal fees to defend against an illegal foreclosure and has sustained emotional distress, loss of sleep anxiety, depression and fear and has sustained damages and will continue to sustain damages on an ongoing basis until this litigation is complete.

## COUNT II
### FRAUD
#### (BNYM, Shellpoint, Resurgent, Sam White)

98. The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-97 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiffs.

18

99. BNYM, Shellpoint, Resurgent, and Sam White have fraudulently asserted that BNYM is the proper party to enforce the Deed of Trust, and that Resurgent actually executed the appointment of Substitute Trustee when it had no authority and Sam White conducted the foreclosure knowing that none of the parties which allegedly appointed Sam White as Trustee wre properly authorized. Fraud is also the failure to apprise others of facts – FV1 has concealed the fact it is not the successor in interest to Residential.

100. BNYM, through its alleged agent, Shellpoint, fraudulently misled Plaintiff into thinking they would use his income to qualify for a loan modification but did not.

101. Neither BNYM, Shellpoint, nor Resurgent had authority to enforce the terms of the Deed of Trust.

102. BNYM has no valid legal evidence to show it was assigned the rights to enforce the terms of the Deed of Trust by the one with those rights to assign.

103. Despite having no assignment of said rights and no evidence it was the UCC holder of the note, BYNM, through its agent Shellpoint unlawfully accelerated the loan, invoked the power of sale through Resurgent , a purported appointed a substitute trustee, who removed the original trustee, and requested that the substitute trustee, Sam White, sell the Property at foreclosure.

104. Foreclosure is an equitable remedy, and that remedy does not accrue until all conditions precedent are satisfied. One of the most important conditions precedent is, of course, that the foreclosing entity have the right to enforce the terms of the Deed of Trust.

105. Given the absence of any lawful evidence that neither BNYM, Shellpoint, Resurgent owns the loan or has the right to invoke the power of sale, Sam White's had a duty to

19

the Plaintiff as the purportedly appointed substitute trustee, to have a document showing that BYNM through Shellpoint and Resurgent, the proper party to foreclose.

106.   Neither BNYM, Shellpoint, nor Resurgent are not the successor in interest to Residential Lending, thus had no authority to accelerate the debt and invoke the power of sale (Deed of Trust ¶22) or to appoint Commonwealth as substitute trustee (Deed of Trust ¶24), as the Lender or its successor has sole discretion on whether or not to take said actions (Deed of Trust ¶16(c)).

107.   WHEREFORE, none of the defendants had no authority to take said actions to foreclose on Plaintiff's Property, fraudulently asserted it had said authority, and fraudulently misled Plaintiff by repeatedly misleading him by stating it could qualify him for a loan modification but never did, Plaintiff relied on those false statements to his detriment.  Plaintiffs respectfully request that this Court award compensatory damages and punitive damages against the Defendants in an amount this Court deems property and whatever other relief the Court deems appropriate.

## COUNT III
### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT VIRGINIA CODE
(Virginia Code § 59.1-196)
(As to Resurgent, Shellpoint, and Sam White)

108.   The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-107 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiffs.

109.    The loan secured by the Deed of Trust is a consumer transaction and Shellpoint, Resurgent and Sam White are suppliers of services as defined by the Virginia Consumer Protection Act Virginia Code § 59.1-196

110.    These Defendant have a duty to follow Applicable Law in conducting a foreclosure.

111.    These Defendants engaged in Prohibited practices as set forth in Virginia Code § 59.1-200.A.13 by knowingly filing false documents in the public record and operating in a biased manner inconsistent with Virginia law for a Servicer or foreclosure Trustee.

112.    These Defendants acted in concert to foreclose on the subject property.

113.    These Defendants knew or should have known that the Deed of Trust as filed on the public record was in conflict with the actions the Defendant took and that all the requite actions have not been taken before the parties could legally foreclose on the Property.

114.    These Defendants employed false and deceptive acts and practices to foreclose on the subject property by deceptively and fraudulently concealed the actual party initiating foreclosure.

115.    These Defendants, and each of them, cannot produce any evidence that any of the Defendants are the rightful party to foreclose on the Property other than self-servicing documents.

116.    These Defendants employed a well-known bad faith practice of dual tracking by encouraging the borrower to apply for a loan modification and then promptly send a foreclosure notice to the borrower.

117.    As a direct and proximate result of Defendants violation of the Virginia Consumer Protection Act, Plaintiffs have not had quiet enjoyment of the Property, has experienced an interference of business, incurred legal costs, experienced duress of the principals and have

otherwise been financially damaged and request that this Court enter an Order awarding them quiet title, punitive and monetary damages in an amount to be set by this Court against Defendants.

## COUNT IV
### Breach of the Duty of Good Faith and Fair Dealing
### (all Defendants)

118.   The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-117 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiffs.

119.   All contracts in Virginia impose a covenant of good faith and fair dealing that is read into every contract in Virginia.

120.   The Defendants all acted in bad faith in their respective roles to deny the Plaintiff the opportunity to modify the loan and foreclose on the subject Property in violation of Applicable Law.

121.   Plaintiff Shellpoint purposefully misled Plaintiff by indicating that it would consider a loan modification and follow the servicing guidelines imposed upon it by the federal government and review her for a loan mod, as it was required to do by law, but in truth had no intention of doing at all and instead sent a foreclosure notice while it was considering whether it would use the Plaintiff's income to qualify for a loan modification.

122.   The Defendants breached their duty of good faith and fair dealing in their respective roles of filing false documents in the public record not revealing the true nature of the loan, misleading the Plaintiff into thinking she was going to get a loan modification, concealing the true nature of the party initiating foreclosure, dual tracking and employing other bad faith and deceptive

acts and practices and by not offering the Plaintiff a viable alternative to foreclosure, all in violation of Applicable law.

123.    As a direct and proximate result of the Defendants' breach of the duty of good faith and fair dealing the Plaintiffs have been damaged by being deprived of the quiet enjoyment of the Property, being required to pay legal fees to defend against an illegal foreclosure and has sustained emotional distress, loss of sleep anxiety, depression and fear and has sustained damages and will continue to sustain damages on an ongoing basis until this litigation is complete.

**COUNT V**
**ABUSE OF PROCESS**
**All Defendants**

124.    The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-113 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiffs.

125.    The Defendants knew or should have known that the party invoking the power of sale in the deed of trust was without proper authority to proceed to foreclosure given that all the conditions precedent had not been satisfied under Applicable Law.

126.    The Defendants are bound by the servicing guidelines of the National Foreclosure Settlement which prohibits the practice of "dual tracking" – reviewing for loan mod while beginning the foreclosure process, and knew they were required to comply with the Secretary of HUD regulations prior to proceeding to sale.

127.    The Defendants together and separately and through its misrepresentations and on behalf of the alleged note holder, Bank of New York Mellon and Shellpoint denied Plaintiff the right to cure the default, and the denied her an alternative to foreclosure and thereby depriving her

23

of an express contractual right that would have avoided foreclosure, and did so in pursuit of foreclosure fees and speed.

128.    The Defendants' failure to comply with the mandatory regulations and directives imposed by Applicable Law did not cause the remedy of foreclosure did not accrue, thus the substitute trustee had nothing to sell on the auction date, yet Bank of New York Mellon via Shellpoint directed SAM WHITE to proceed to sale having full knowledge that they were not complying with all Applicable Law.

129.    The actions of the Defendants, Bank of New York Mellon, Resurgent, Shellpoint, FFC Properties and Samuel I. White amounts to an abuse of the non-judicial foreclosure process and a violation of the Deed of Trust, and Applicable Law and illegally foreclosed on Plaintiff's property fully aware it was acting in violation of the contract and Applicable Law, and aware that its actions would not involve court oversight as they are non-judicial.

130.    As a direct and proximate result of the Defendants' abuse of the judicial process the Plaintiffs have been damaged by being deprived of the quiet enjoyment of the Property, being required to pay legal fees to defend against an illegal foreclosure and has sustained emotional distress, loss of sleep anxiety, depression and fear and has sustained damages and will continue to sustain damages on an ongoing basis until this litigation is complete.

### COUNT VI
### Slander of Title—In the Public Record
### (All Defendants)

131.    The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-130 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiffs.

24

132.     By recording inaccurate and misleading documents on the public land records of

Fairfax County, the Resurgent, Shellpoint, Bank of New York Mellon and FFC published false

words, which disparaged Plaintiff's title to the Property – namely that there was a lawful

foreclosure following a default in the underlying loan documents and a foreclosure was properly

conducted in compliance with the terms of the deed of trust, when in fact there was no right to

accelerate given that the Defendants failed to comply with mandatory HUD regulations and

Federal and Virginia Statute and misled Plaintiff during the loan modification review and

foreclosed on her home after telling her that the home would not be foreclosed on while she was

being reviewed, as required by the servicing guidelines of the National Foreclosure Settlement, to

which the original Servicer, Bank of New York, was a party.

133.     All defendants knew or should have known that they had no right to foreclose and

misled Plaintiff into thinking he was going to get a loan modification and while simultaneously

sending a foreclosure notice and in failing to comply with mandatory requirements of Applicable

Law prior to acceleration and foreclosure.

134.     The Defendants caused false documents to be recorded in the public record which

were not accurate and used those documents to accelerate and foreclose on the property before the

mandatory regulations were complied with.

135.     The publication of the false words were the actual and proximate cause of actual

damages suffered by Plaintiff in retaining legal counsel, destroyed credit scores and credit history,

increased interest rates, and of special damages arising from lost opportunities for credit. These

damages continue to accrue, as long as the documents remains in the land records unreleased.

136.     As a direct and proximate result of the Defendants' Slander of Title the Plaintiffs

have been damaged by being deprived of the quiet enjoyment of the Property, being required to

pay legal fees to defend against an illegal foreclosure and has sustained emotional distress, loss of sleep anxiety, depression and fear and has sustained damages and will continue to sustain damages on an ongoing basis until this litigation is complete.

**COUNT VII**
**VIOLATION OF FDCPA**
**VIOLATION OF 15 U.S.C. § 1692e**
**(Bank of New York, Resurgent, Shellpoint and Sam White)**

137.   The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-136 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiff.

138.   15 USC 1692e states in part "[A] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."

139.   15 USC 1692f] states that "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.

140.   15 USC 1692j provides that "(a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating."

141.   Defendants, Bank of New York, Resurgent, Shellpoint and SAM WHITE are "debt collectors" as defined by the FDCPA. All Defendants used false, deceptive and misleading representations or means in connection with the collection of the alleged debt from the Plaintiff, by not revealing the true identity of the entity initiating foreclosure and by not revealing the true identity of the party to whom the debt is owed, by filing false information in the public records,

knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating, by falsely represented the character, amount and legal status of the alleged debt in the Credit Bureaus, threaten to take any action that cannot legally be taken or that is not intended to be taken.in violation of 15 U.S.C. §1692e(5), and on the public Land Records, misrepresenting the Plaintiff into thinking she was going to get a loan modification with no intention to modify the loan, sending out foreclosure notices while a loan modification was pending, a threaten to take any action that cannot legally be taken or that is not intended to be taken.in violation of 15 U.S.C. §1692e(5), and them ultimately foreclosing on the Property.

142.    These Defendants are each liable to the Plaintiffs for their actual damages sustained, statutory damages, and reasonable attorney's fees and costs as provided for by 15 U.S.C. §1692k.

143.    As a direct and proximate result of these Defendants violation of the FDCPA the Plaintiff has not had quiet enjoyment of the Property, has experienced an interference of business, incurred legal costs, experienced duress of the principals and have otherwise been financially damaged and request that this Court enter an Order awarding them quiet title, punitive and monetary damages in an amount to be set by this Court against Defendants.

**COUNT VIII**
**VIRGINIA CIVIL CONSPIRACY**
**(As to Shellpoint, Resurgent, and Sam White)**

144.    The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-143 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiffs.

27

145. As alleged herein, These Defendants have vast experience in using unfair and deceptive practices to foreclose on residential properties as outlined in the National Settlement. These Defendants combined to accomplish by concerted effort – together and with their third party collection law firms – to use unlawful means for an unlawful purpose.

146. These Defendants together played their respective role in either filing falsified Corporate Assignments and Appointments of Substitute Trustee on the public land records, or working under the authority of another defendant to give them authority to conduct a non-judicial foreclosure process knowing that the documents were false when filed and *with intent to illegally foreclose* on real property for a debt the Defendants knew they could not otherwise verify or prove.

147. These Defendants had separate and personal stakes in the illegal objectives alleged herein.

148. Defendants conducted themselves in this manner *with intent* to defraud and with legal and actual malice as to the Plaintiff and to the Civil Courts. The Plaintiff is entitled to and each Defendant is obligated to pay punitive damages.

149. As a direct and proximate result of these Defendants' civil conspiracy, Plaintiff suffered actual damages in the form of economic injury to their credit, the need to have paid attorneys to defend them against the illegal activity of the Defendants trying to recover on a debt that was not owed to the alleged note holder, entitling the Plaintiffs to punitive damages, and recovery for substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over this litigation, the Plaintiffs loss of quiet enjoyment of the Property, an interference of business, incurred legal costs, experienced duress of the principals and have otherwise been financially damaged and request that this Court enter an Order awarding them

28

a rescission of the foreclosure sale, punitive and monetary damages in an amount to be set by this Court against all Defendants.

**COUNT IX**
**EQUITABLE ACTION TO RESCIND FORECLOSURE SALE**
(To strike false documents from the land records - See Va Code §55-153)
(All Defendants)

150.    The Plaintiff restates, repeats and realleges each and every allegation in paragraphs 1-139 above as if fully stated herein. All facts related to this Count below are considered facts pled by Plaintiffs.

151.    Resurgent Capital Services, LLC, was allegedly commissioned by Bank of New York Mellon service the subject loan and to appoint Sam White (thus SAM WHITE acted as its agent and it is responsible for the actions of its agent), paid it fees, then asked the Sam White to foreclose on the Property when CWALT 2007-OA8 had no authority to so act.

152.    All Defendants violated the terms of the Deed of Trust, as it failed to strictly comply with the terms of the trust document, made material misrepresentations in the documents appointing SAM WHITE and the Assignments, and proceeded to foreclose on the Property when it was fully aware of the fact it had no authority to so act.

153.    The defendants were fully aware it had no authority to enforce the obligation and was not the party secured by the Deed of Trust as it never paid value for the Note and has no losses.

154.    As of the date of this document all the requisite conditions precedent have not been satisfied to authorize any of the Defendants to initiate foreclosure on the Property. \

155.    The remedy of foreclosure never accrued as Defendants failed to comply with mandatory Regulations imposed by the stated Deed of Trust governing law stated as Applicable Law, as all the Defendants were obligated to follow.

29

156.   Rescission of the foreclosure is the only property remedy under Applicable Law.

157.   The Defendants repeatedly, itself or through hits agents, or in concert with the other defendants repeatedly failed to provide the loan modification, on, failed to provide the counseling offered and required by law and the servicing guidelines of the National Settlement, to which BoA was a party and its successors are bound thereby.

158.   The Defendants, itself, by its agents, and/ or in concert with the other defendants repeatedly turned down Plaintiff's efforts to modify her loan in pursuit of its own financial interests.

159.   The Defendants, itself, by its agents, and/ or in concert with the other defendants repeatedly made false misrepresentations concerning its efforts to modify the loan and avoid foreclose while reviewing Plaintiff for a loan mod.

160.   The Defendants, itself, by its agents, and/ or in concert with the other defendants took steps to accelerate the debt, appoint the substitute trustee and invoke the power of sale, when it and had no authority to so act, and denied Plaintiff her right to cure the default by repeating is false statements that it would not foreclosure while she was being reviewed for a loan mod.

161.   As a result of Defendants' respective actions in violation of Applicable law as outlined above, Plaintiff suffered actual damages in the form of economic injury to their credit, the need to have paid attorneys to defend them against the illegal activity of the Defendants trying to recover on a debt that was not owed to the alleged note holder, entitling the Plaintiffs to punitive damages, and recovery for substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over this litigation, the Plaintiffs loss of quiet enjoyment of the Property, an interference of business, incurred legal costs, experienced duress of the principals and have otherwise been financially damaged and request that this Court enter an

Order awarding them a rescission of the foreclosure sale, punitive and monetary damages in an amount to be set by this Court against all Defendants.

WHEREFORE, Plaintiff respectfully requests that given the lack of authority to enforce the terms of the Deed of Trust, the unclean hands of the Defendants in preparing on their face false documents to be recorded among the lands records of Loudoun County, and the balance of the equities clearly favoring the Plaintiff, the court enter an Order rescinding the foreclosure sale as having been conducted in violation of the terms of the trust document and without having satisfied all conditions precedent therein, and award Plaintiff all equitable damages of the suit, as but for the false and fraudulent actions of these Defendant he would not have suffered said damages: loss of title to her Property, costs of the suit, attorney's fees and any other relief the Court deems just and necessary for the administration of justice.

Plaintiff further respectfully prays that judgment be entered against the Defendants for the following:

A. The Plaintiffs seek injunctive relief to request that this Court rescind the sale conducted on or about February 26, 2015 declaring it to be null and void and of no effect on the Property because the Defendants acted without proper authority to initiate a foreclosure;

B. Declaratory judgment that Defendants conduct violated the FDCPA, and the VCPA;

C. Declaratory judgment that the Defendants have abused Virginia's non-judicial foreclosure process;

D. Judgment against Defendants for Breach of the Deed of Trust under Applicable Law;

E. Judgment against Defendants for actual damages sustained by Plaintiffs against all Defendants;

31

F.  Judgment against Defendants for statutory damages pursuant to the FDCPA and VCPA;

G.  Judgment against Defendants for Punitive Damages against Defendants;

H.  Interest on the aforementioned judgments at the maximum rate and for the maximum duration allowed by law;

I.  An award of Attorney's fees and costs as required under FDCPA, VCPA and all Applicable Law.

J.  Any and all other relief to which Plaintiff may be entitled, including the right to amend this Complaint to add additional claims and/or additional parties after conducting appropriate discovery and any further relief that this Court may deem just and proper.

JURY TRIAL IS DEMANDED ON ALL COUNTS

32

Respectfully Submitted,

ORVILLE CAIN
By Counsel,

Rocco DeLeonardis VSB#39761
Virginia Law, PLC
11480 Sunset Hills Road, Suite 120E
Reston, Virginia 20190
*Co-Counsel for Plaintiff*

Christopher E. Brown, VSB#39852
526 King Street, Suite 207
Alexandria, Virginia 22314
Tel. 703.924.0223
Fax 703.997.2362
brownfirm@lawyer.com
*Counsel for Plaintiff*

<u>Exhibits to Complaint</u>

Exhibit A – Excepts of National Settlement
Exhibit B – Deed of Trust
Exhibit C – Promissory Note
Exhibit D – Appointment of Substitute Trustee
Exhibit E – MERS Assignment
Exhibit F – MERS Answer
Exhibit G – MERS Transcript
Exhibit H – MERS Rules
Exhibit I –  MERS Rules Details
Exhibit J –  MERS Procedure
Exhibit K - Fannie Mae 2006 Directive re MERS
Exhibit L – P&S Agreement excerpts

33

## Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                )
555 4th Street, NW                       )
Washington, DC 20530                     )
                                         )
THE STATE OF ALABAMA,                    )
501 Washington Avenue                    )
Montgomery, AL 36130                     )
                                         )
THE STATE OF ALASKA,                     )
1031 W. 4th Avenue, Ste. 200             )
Anchorage, AK 99501                      )
                                         )
THE STATE OF ARIZONA,                    )
1275 W. Washington                       )
Phoenix, AZ 85007                        )
                                         )
THE STATE OF ARKANSAS,                   )
323 Center Street, Suite 200             )
Little Rock, Arkansas 72201              )
                                         )
THE STATE OF CALIFORNIA,                 )
455 Golden Gate Avenue, Ste. 14500       )
San Francisco, CA 94102-7007             )
                                         )
THE STATE OF COLORADO,                   )
1525 Sherman Street – 7th Floor          )
Denver, Colorado 80203                   )
                                         )
THE STATE OF CONNECTICUT,                )
55 Elm Street, P.O. Box 120              )
Hartford, CT 06141-0120                  )
                                         )
THE STATE OF DELAWARE,                   )
820 N. French Street                     )
Wilmington, DE 19801                     )
                                         )
THE STATE OF FLORIDA,                    )
3507 E. Frontage Road                    )
Suite 325                                )
Tamp, FL 33607                           )
                                         )

THE STATE OF UTAH,                    )
350 North State Street, #230          )
Salt Lake City, UT 84114-2320         )
                                      )
THE STATE OF VERMONT,                 )
109 State Street                      )
Montpelier, Vermont 05609             )
                                      )
THE COMMONWEALTH OF VIRGINIA,         )
900 East Main Street                  )
Richmond, Virginia 23219              )
                                      )
THE STATE OF WASHINGTON,              )
1250 Pacific Avenue, Suite 105        )
PO Box 2317                           )
Tacoma, WA 98402-4411                 )
                                      )
THE STATE OF WEST VIRGINIA,           )
State Capitol, Room 26E               )
Charleston, WV 25305-0220             )
                                      )
THE STATE OF WISCONSIN,               )
Post Office Box 7857                  )
Madison, Wisconsin 53707-7857         )
                                      )
THE STATE OF WYOMING, and             )
123 State Capitol Bldg                )
200 W. 24th                           )
Cheyenne, WY 82002                    )
                                      )
THE DISTRICT OF COLUMBIA,             )
441 Fourth Street, N.W., Suite 600-S  )
Washington, DC 20001                  )
                                      )
                 Plaintiffs,          )
                                      )
          v.                          )
                                      )
BANK OF AMERICA CORPORATION,          )
Corporate Center 100                  )
100 North Tryon Street                )
Charlotte, North Carolina 28255       )
                                      )
BANK OF AMERICA, N.A.,                )
100 North Tryon Street                )

5

investors who agree to partial or full extinguishment of second liens associated with an FHA refinance.

45.     *The FHA Refinance for Borrowers with Negative Equity (FHA Short Refinance) Program.* This program is partially supported by TARP funds and allows servicers and investors who write down a borrower's principal balance on a non-FHA-insured, existing, underwater, first-lien mortgage loan in connection with a refinancing to obtain FHA insurance on the newly refinanced mortgage. Treasury has provided a TARP-funded letter of credit for up to $8 billion in loss coverage on these newly refinanced FHA loans.

46.     *Housing Finance Agency Hardest Hit Fund (HHF).* HHF is a TARP-funded program designed to fund foreclosure prevention programs run by state housing finance agencies in states hit hardest by the decrease in home prices and in states with high unemployment rates. Eighteen states and Washington, D.C. have received approval for aid through this program.

## FACTUAL ALLEGATIONS

**A.     The Banks' Servicing Misconduct**

47.     Each of the Banks services home mortgage loans secured by residential properties owned by individual citizens of the Plaintiff States, and of the United States.

48.     Each Bank is engaged in trade or commerce in each of the Plaintiff States and is subject to the consumer protection laws of the States in the conduct of their debt collection, loss mitigation and foreclosure activities. The consumer

protection laws of the Plaintiff States include laws prohibiting unfair or deceptive practices.

### 1. The Banks' Unfair, Deceptive, and Unlawful Servicing Processes

49.     Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

50.     In the course of their conduct, management and oversight of loan servicing in the Plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

51.     The Banks' unfair and deceptive practices in the discharge of their loan servicing activities, include, but are not limited to, the following:

a.      failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;

b.      charging excessive or improper fees for default-related services;

c.      failing to properly oversee third party vendors involved in servicing activities on behalf of the Banks;

d.      imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

e.      providing borrowers false or misleading information in response to borrower complaints; and

f.      failing to maintain appropriate staffing, training, and quality control systems.

### 2. The Banks' Unfair, Deceptive, and Unlawful Loan Modification and Loss Mitigation Processes

52.     Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

53.     Pursuant to HUD regulations and FHA guidance, FHA-approved mortgage lenders and their servicers are required to engage in loss-mitigation efforts to avoid the foreclosure of HUD-insured single family residential mortgages. E.g., 24 C.F.R. § 203.500 et seq.; Mortgagee Letter 2008-07 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008); Mortgagee Letter 1996-25 ("Existing Alternatives to Foreclosure -- Loss Mitigation") (May 8, 1996). Thus, when acting as a servicer, the Banks were required to refrain from foreclosing on any FHA insured mortgage where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available.

54.     Under the Treasury's various rescue and stimulus programs, the Banks received monetary incentives from the Federal government in exchange for the commitment to make efforts to modify defaulting borrowers' single family residential mortgages. See, e.g., Making Home Affordable Handbook v.1.0, ch. 13 ("Incentive Compensation") (Aug. 19, 2010). Under the programs, the Banks agreed to fulfill requirements set forth in program guidelines and servicer participation agreements.

55.     Each of the Banks regularly conducts or manages loan modifications on behalf of the entities that hold the loans and mortgages and that hired the Banks as servicers.

56.     In the course of their servicing and oversight of mortgage loans, the Banks violated federal laws, program requirements and contractual requirements governing loss mitigation.

57.     In the course of their conduct, management and oversight of loan modifications in the plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

58.     The Banks' failure to discharge their required loan modification obligations, and related unfair and deceptive practices, include, but are not limited to, the following:

     a.     failing to perform proper loan modification underwriting;

     b.     failing to gather or losing loan modification application documentation and other paper work;

     c.     failing to provide adequate staffing to implement programs;

     d.     failing to adequately train staff responsible for loan modifications;

     e.     failing to establish adequate processes for loan modifications;

     f.     allowing borrowers to stay in trial modifications for excessive time periods;

     g.     wrongfully denying modification applications;

h.   failing to respond to borrower inquiries;

i.   providing false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

j.   providing false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;

k.   providing false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

l.   misrepresenting to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

m.   failing to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

n.   falsely advising borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

o.   miscalculating borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;

p.    misleading borrowers by representing that loan modification applications will be handled promptly when Banks regularly fail to act on loan modifications in a timely manner;

q.    failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;

r.    failing to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

s.    misleading borrowers by providing false or deceptive reasons for denial of loan modifications.

**3.    Wrongful Conduct Related to Foreclosures**

59.    Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

60.    FHA regulations and guidance and HAMP and other MHA servicer participation agreements establish requirements to be followed in the foreclosure of single family residential mortgages that are FHA insured, or where the servicer conducting the foreclosure is an MHA participant.

61.    Each of the Banks regularly conducts or manages foreclosures on behalf of entities that hold mortgage loans and have contracted with the Bank to service such loans.

62.     In the course of their conduct, management, and oversight of foreclosures, the Banks violated FHA and MHA foreclosure requirements.

63.     In the course of their conduct, management, and oversight of foreclosures in the plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

64.     The Banks' failure to follow appropriate foreclosure procedures, and related unfair and deceptive practices include, but are not limited to, the following:

   a.     failing to properly identify the foreclosing party;

   b.     charging improper fees related to foreclosures;

   c.     preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

   d.     preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of the Banks, they did so with the knowledge and approval of the Banks;

27

    e.    executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

    f.    misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

    g.    inappropriately charging servicing, document creation, recordation and other costs and expenses related to foreclosures; and

    h.    inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities.

**B.    The Banks' Origination Misconduct**

    **1.    Unfair and Deceptive Origination Practices**

65.    Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

66.    Each of the Banks regularly originates mortgage loans.

67.    In the course of their origination of mortgage loans in the Plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices. Among other consequences, these practices caused borrowers in the Plaintiff States to enter into unaffordable mortgage loans that led to increased foreclosures in the States.

    **2.    The Direct Endorsement Program**

68.    The FHA's Direct Endorsement Program is a vital part of its single-family insured mortgage program. Under the Direct Endorsement

# Exhibit B

Return To
George Mason Mortgage, LLC
4100 Monument Corner Dr, Ste 100
Fairfax, VA 22030

Tax Map Reference #

RPC/Parcel ID #
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-000

Prepared By
HARVEY,CHARLOTTE
12150 Monument Drive, #425
Fairfax, VA 22033

20070103-0000341

— [Space Above This Line For Recording Data] —

# DEED OF TRUST

MIN 1000633-0000937989-8

The following information, as further defined below, is provided in accordance with Virginia law

This Deed of Trust is given by INEZ E CAIN, UNMARRIED

Borrower (Trustor), to MICHAEL P HUGSTON and
BEN FOX of
PREMIER MORTGAGE COMPANY, LLC
12150 MONUMENT DRIVE SUITE 425, FAIRFAX, VA 22033
Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc. as beneficiary

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

88CAIN,INEZ                          937989                                    9
VIRGINIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3047 1/01

OL I c AI

(A) "Security Instrument" means this document, which is dated   December 29, 2206
together with all Riders to this document

(B) "Borrower" is INEZ E CAIN, UNMARRIED

Borrower is the trustor under this Security Instrument

(C) "Lender" is PREMIER MORTGAGE COMPANY, LLC

Lender is A VIRGINIA CORPORATION
organized and existing under the laws of              STATE OF VIRGINIA
Lender's address is 12150 MONUMENT DRIVE, #425, FAIRFAX, VA 22033

(D) "Trustee" is MICHAEL P HOUSTON

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered
corporation whose principal office is located in Virginia   Trustee's address is
12150 MONUMENT DRIVE SUITE 425, FAIRFAX, VA 22033
"Trustee" is BEN FOX

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered
corporation whose principal office is located in Virginia   Trustee's address is
12150 MONUMENT DRIVE SUITE 425, FAIRFAX, VA 22033

(E) "MERS" is Mortgage Electronic Registration Systems, Inc MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns MERS is the beneficiary
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P O Box 2026, Flint, MI 48501-2026, tel (888) 679-MERS

(F) "Note" means the promissory note signed by Borrower and dated   December 29, 2206
The Note states that Borrower owes Lender One Million and no/100
                                                                          Dollars
(U S $1,000,000 00        ) plus interest Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   January 1, 2037   The interest rate
stated in the Note is One and One / Half
                                              percent ( 1 5000      %)
If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in
accordance with the attached Adjustable Rate Rider

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property"

88CAIN, INEZ                                937989            _init_ OC I.C. µ        0
[logo]-6A(VA) oosos        Page 1 of 11                       Form 3047 1/01

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower  The following Riders are to be executed by Borrower [check box as applicable]

[X] Adjustable Rate Rider      [ ] Condominium Rider            [ ] Second Home Rider
[ ] Balloon Rider              [X] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider                   [ ] Biweekly Payment Rider       [ ] Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers

(M) "Escrow Items" means those items that are described in Section 3

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for (i) damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the Property, (iii) conveyance in lieu of condemnation, or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U S C  Section 2601 et seq ) and its implementing regulation, Regulation X (24 C F R  Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument

88CA1N. 1M Z                          937989              _____ _OC_ _I.C._ _av___        0

[ ] -6R(VA) (0405)                    Page 2 of 15                Form 3047  1/01

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                    [Type of Recording Jurisdiction]
of           LOUDOUN           [Name of Recording Jurisdiction]
LOT 3  LAND BAY "K" PHASE IX, SECTION 1, RIVER CREEK, AS THE SAME
APPEARS  DULY DEDICATED, PLATTED AND RECORDED AT INSTRUMENT #
20040406-0031803 (PLAT AT INSTRUMENT # 20040406-0031804), AMONG THE LAND
RECORDS OF LOUDOUN COUNTY, VIRGINIA

which currently has the address of 18392 FAIRWAY OAKS SQUARE                    [Street]
LEESBURG                              [City/County], Virginia   20176       [Zip Code]
("Property Address")

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

   UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

BHCAIN.INEZ                          937989                    Initials OC  I,c, H      0
[logo] 6A(VA) [0405]                 Page 3 of 15                                  Form 3047  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity, or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note, (b) principal due under the Note, (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under

88CAIN.1NEZ          937989          __OC I.c. K__          0

payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense  Lender is under no obligation to purchase any particular type or amount of coverage  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee  Lender shall have the right to hold the policies and renewal certificates  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender  Lender may make proof of loss if not made promptly by Borrower  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower  Such insurance proceeds shall be applied in the order provided for in Section 2

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim  The 30-day period will begin when the notice is given  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage  If insurance or

condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repair and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court, and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage

BBCAIN, INEZ                    937989                                              0

Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

88CAIN. INEZ                       937989                              OC  Ic. M        0

Form 3047  1/01

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the

permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument, (b) such other period as Applicable Law might specify for the termination of

88CAIN, INEZ          937989                                     D

GMFS (VA)                    Page 11 of 15          Initials: OC  I.C. K          Form 3047  1/01

Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred, (b) cures any default of any other covenants or agreements, (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, and (d) takes such action as Lender may reasonably require to assure that the Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity, or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21 (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials, (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection, (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law, and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any tenant of record inferior to this Security Instrument under which sale is made, with lawful interest; and. (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                 INEZ E CAIN              -Borrower

_____          _____ (Seal)
                                                          -Borrower

_____ (Seal)           _____ (Seal)
                -Borrower                                 -Borrower

_____ (Seal)           _____ (Seal)
                -Borrower                                 -Borrower

_____ (Seal)           _____ (Seal)
                -Borrower                                 -Borrower


88CAIN, INEZ                     937989                   0

D6A(VA) (0810)                   Page 14 of 15            Form 3047 1/01

STATE OF VIRGINIA,          LOUDOUN     County, ss:

The foregoing instrument was acknowledged before me this   December 29, 2206      by
INEZ E  CAIN

My Commission Expires  4,3,2010          _____
                                         Notary Public

                                         KYOSHOW DAVARI
                                         My Comm ision Expired April 30, 2018
                                         Notary for the State of Virginia

38CAIN. INEZ              937989          DC I.C. M    0
(VA)(0601)               Page 12 of 15          Form 3047 1/01

# Exhibit C

88CAIN.1NEZ                              937989

## ADJUSTABLE RATE NOTE
(LIBOR One-Month Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT
THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE
PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT
ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT
STATED IN THIS NOTE.**

December 29, 2206          FAIRFAX              Virginia
        (Date)               (City)              (State)

18392 FAIRWAY OAKS SQUARE      ,LEESBURG,VA 20176
                   (Property Address)

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U S $ 1,000,000 00      (this amount is
called "Principal"), plus interest, to the order of Lender  The Principal amount may increase as provided under
the terms of this Note but will never exceed (   $1,150,000 00          ) of the
Principal amount I originally borrowed  This is called the "Maximum Limit " Lender is
PREMIER MORTGAGE COMPANY, LLC, A VIRGINIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order
      I understand that Lender may transfer this Note  Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder "

### 2.  INTEREST

(A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid  I will pay
interest at a yearly rate of  1 500  %  The interest rate I will pay may change
      The interest rate required by this Section 2 is the rate I will pay both before and after any default described
in Section 7(B) of this Note

(B)  Interest Rate Change Dates
The interest rate I will pay may change on the    1st      day of  February 2007
and on that day every month thereafter  Each date on which my interest rate could change is called an "Interest
Rate Change Date "  The new rate of interest will become effective on each Interest Rate Change Date  The
interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3

(C)  Index
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index
The "Index" is the average of interbank offered rates for one month U S  dollar-denominated deposits in the
London market ("LIBOR"), as published in The Wall Street Journal  The most recent Index figure available as of
the date 15 days before each Interest Rate Change Date is called the "Current Index"
      If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable
information  The Note Holder will give me notice of this choice

(D)  Calculation of Interest Rate Changes
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
Three and Nine / Fortieths  percentage points(s)  3 2250  % ("Margin") to the Current Index  The
Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point
(0 125%)  This rounded amount will be my new interest rate until the next Interest Rate Change Date  My
interest will never be greater than  9 950    %  Beginning with the first Interest Rate Change Date, my interest
rate will never be lower than the Margin

### 3.  PAYMENTS

(A)  Time and Place of Payments
I will make a payment every month
I will make my monthly payments on the    1st      day of each month beginning on
February 2007       I will make these payments every month until I have paid all the Principal and
interest and any other charges described below that I may owe under this Note  Each monthly payment will be
applied as of its scheduled due date and will be applied to interest before Principal  If, on
January 1, 2037      , I still owe amounts under this Note, I will pay those amounts in full on that date,
which is called the "Maturity Date "
I will make my monthly payments at
12150 MONUMENT DRIVE, #425, FAIRFAX, VA 22033
or at a different place if required by the Note Holder

COD  CIN-VA PC US NOTE 02/06
PerSpecta 01/06 State 1 NOTE Section
R0-6372EW7

**ORIGINAL**

810  147946698  N  001  001

88CAIN.IREZ        937989

**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U S $ 3,451 20    unless adjusted under Section 3 (F)

**(C) Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the   1st   day of   February 2008  , and on that day every 12th month thereafter Each of these dates is called a "Payment Change Date " My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below

**(D) Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date The result of this calculation is called the "Full Payment " Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7 5% of my prior monthly payment This 7 5% limitation is called the "Payment Cap " This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument The Note Holder will calculate the amount of the Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1 075 The result of this calculation is called the "Limited Payment " Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment I also have the option to pay the Full Payment for my monthly payment

**(E) Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 3 For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A)

**(F) Limit on My Unpaid Principal Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to   115 0   percent of the Principal amount I originally borrowed My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7 5% Payment Cap The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate

**(G) Required Full Payment**
On the   5th   Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date

**(H) Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options " I may be given the following Payment Options
  (i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment
  (ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments
  (iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term
These Payment Options are only applicable if they are greater than the Minimum Payment

**4.   NOTICE OF CHANGES**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits, and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7   BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A)   Late Charges for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00   % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

**(B)   Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)   Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)   No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)   Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

88CAIN, INEZ                                      937989

**10.  WAIVERS**
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below). "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid

**11.  SECURED NOTE**
In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
INEZ E  CAIN                    -Borrower

_____ (Seal)
                                -Borrower

PAY TO THE ORDER OF

_____ (Seal)
                                -Borrower

WITHOUT RECOURSE

COUNTRYWIDE BANK, N.A.

BY:_____ (Seal)
    LAURIE MEDES               -Borrower
    SENIOR VICE PRESIDENT

PayOption ARM Note LIBOR Index
FE-5210(VA) (0411)                Page 4 of 6

PAY TO THE ORDER OF
GEORGE MASON MORTGAGE, LLC
WITHOUT RECOURSE
PREMIER MORTGAGE COMPANY, LLC
BY:

MICHAEL N. HOUSTON, VICE PRESIDENT

PAY TO THE ORDER OF
COUNTRYWIDE BANK, N.A.
WITHOUT RECOURSE
GEORGE MASON MORTGAGE, LLC
BY:

TEENA M. GOSA/VICE PRESIDENT

# Exhibit D

7196 9006 9297 2926 5731

01-013322-13

File No. 01-013322-13 Cain

## SUBSTITUTION OF TRUSTEE

**GRANTOR:** <u>THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA8, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA8,</u> Its successors and/or assigns

**GRANTOR:** Inez E. Cain
(for indexing purposes only)

**GRANTOR:** Michael P. Houston and Ben Fox
( Original Trustee(s)  for indexing purposes only)

**GRANTEE:**   SAMUEL I. WHITE, P.C.
               5040 Corporate Woods Drive, Suite 120, Virginia Beach, VA 23462

WHEREAS, THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA8, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA8 is the present holder or the authorized agent of the holder of the note secured by the deed of trust dated December 29, 2006 and recorded January 3, 2007 in Instrument 20070103-0000341 among the Land Records of Loudoun County, Virginia.

NOW, THEREFORE, by virtue of the authority contained in the aforementioned deed of trust, the undersigned does hereby remove the Original Trustee(s) as Trustee(s), and does also hereby remove any substitute trustee or trustees who may have been previously appointed in place of the Original Trustee(s), and does hereby appoint SAMUEL I. WHITE, P.C., of the City of Virginia Beach, Virginia, as Substitute Trustee, and said Substitute Trustee shall in accordance with the provisions of said deed of trust, succeed to all the title, powers and duties conferred upon the Original Trustee(s) by the terms of said deed of trust and by applicable law.

THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA8, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA8

BY: *Melissa Woods*

Name: *Melissa Woods*

Title: *Authorized Representative*

By Resurgent Capital Services, LP, Attorney in Fact

STATE OF Texas

CITY/COUNTY OF Houston / Harris        , to-wit:

Acknowledged before me this  7  day of December , 2013, by
Melissa W Woods       , Authorized Representative (title) of Resurgent
Capital Services, LP, Attorney in Fact for THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA8, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA8

_____
Notary Public                    (seal)

My Commission Expires: 02/26/17

GPIN/TAX MAP ID Number: 080 46 9871 000
Prepared by and return to:  Samuel I. White, P.C.
5040 Corporate Woods Drive, Suite 120, Virginia Beach, VA 23462

SUZETTE FIGARO
Notary Public, State of Texas
My Commission Expires
February 26, 2017



# Exhibit E

Recording Requested By
Bank of America
Prepared By
Danelo Cesaro
450 E. Boundary St
Chapin, SC 29036
888-603-9011
When recorded mail to
CoreLogic
450 E. Boundary St
Attn: Release Dept
Chapin, SC 29036

DocID# 13914794469794466
G-Fin  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-000
Property Address
18393 Fairway Oaks Sq
Leesburg, VA 20176-5480

20111007-0062125
Loudoun County, VA
10/07/2011 3:39 am
Gary R. Clemens   Clerk

MIN # 1000133-0020917901-8        MERS Phone #  888-679-6377

## NOTICE OF ASSIGNMENT OF DEED OF TRUST

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC , the undersigned holder of a Deed of Trust (herein "Grantor") whose address is 3300 E W 34th Avenue, Suite 101 Ocala, FL 34474 does hereby grant, sell, assign, transfer and convey unto THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWALT, INC , ALTERNATIVE LOAN TRUST 2007-OA8 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA8 (herein "Grantee") whose address is 101 BARCLAY ST · GW, NEW YORK ,NY 10286 all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust

Original Lender        PREMIER MORTGAGE COMPANY, LLC
Made By                INEZ E. CAIN, UNMARRIED
Original Trustee       MICHAEL P HOUSTON AND BEN FOX
Date of Deed of Trust  12/29/2006     Original Loan Amount  $1,200,098.00
Recorded in Loudoun County, VA  on  1/3/2007, book N/A, page N/A and instrument number 20070103-0000342

IN WITNESS WHEREOF, the undersigned has created this Assignment of Deed of Trust to be executed on
9-13-2011

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC

By
Martha Munoz, Vice President

State of California
County of Ventura

On Sept 13th 2011 before me,  Evette Chanian , Notary Public, personally appeared Martha Munoz
, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct

WITNESS my hand and official seal

Notary Public                               (Seal)
My Commission Expires

EVETTE CHANIAN
COMM #1787625
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Oct 22, 2011

618  14794698  D8  001  003

# Exhibit F

VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

WARREN KELLY and SHELLEY KELLY,   )
                                  )
                Plaintiffs,       )
                                  )
v.                                )   Case No. CL2011-15719
                                  )
MORTGAGE ELECTRONIC REGISTRATION  )
SYSTEMS, INC., et al.,            )
                                  )
                Defendants.       )
                                  )

### ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANTS MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., BANK OF AMERICA, N.A. AND FEDERAL NATIONAL MORTGAGE ASSOCIATION

Defendants Mortgage Electronic Registration Systems, Inc. ("MERS"), Bank of America, N.A., as successor by merger to BAC Home Loans Servicing, LP ("BANA"), and Federal National Mortgage Association ("Fannie Mae"), by counsel and pursuant to Rule 3:8 of the Rules of Supreme Court of Virginia and the Court's Order dated October 12, 2012, hereby answer Plaintiffs' Amended Complaint as follows:

### FACTS

1.    Admitted, upon information and belief.

2.    It is admitted that the contents of Exhibit A speak for themselves, but to the extent that the allegations of this Paragraph conflict with said contents, they are denied.

3.    It is admitted that the contents of Exhibit A speak for themselves, but to the extent that the allegations of this Paragraph conflict with said contents, they are denied.

1

74. It is denied that the only evidence that BANA is the party secured by the Deed of Trust is the Substitution of Trustee and Corporation Assignment of Deed of Trust. It is admitted that the Substitution of Trustee and Corporation Assignment of Deed of Trust were prepared and recorded by SIW. It is denied that the Substitution of Trustee and Corporation Assignment of Deed of Trust were executed by SIW. Except as admitted, all other, remaining allegations of this Paragraph are denied.

75. It is admitted that, per MERS' own rules, it cannot assign interests in promissory notes but it is denied that MERS cannot assign interests in deeds of trust. Except as admitted, all other, remaining allegations of this Paragraph are denied.

76. It is admitted that, per MERS' own procedures, it cannot assign interests in promissory notes but it is denied that MERS cannot assign interests in deeds of trust. Except as admitted, all other, remaining allegations of this Paragraph are denied.

77. It is admitted that MERS generally has no authority to transfer interests in promissory notes but it is denied that MERS generally has no authority to transfer interests in deeds of trust.

78. Admitted.

79. It is admitted the Corporation Assignment of Deed of Trust was prepared by SIW and was executed on behalf of MERS by its Assistant Secretary, Diana Hetrick, who is also an employee of SIW. It is denied that the Corporation Assignment of Deed of Trust was not an assignment for value received. Except as admitted, all other, remaining allegations of this Paragraph are denied.

80. Denied.

15

# Exhibit G

1

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY


```
----------------------------:
JOSEPH FOMENKY,             :
       Plaintiff,           :
                            :
vs.                         :   Case No. CL2012-02497
                            :
LXS 2005-7N TRUST, et al.,  :
       Defendant.           :
----------------------------:
```

                                 Fairfax, Virginia
                     Wednesday, May 29, 2013


     The following pages constitute the proceedings

held in the above-captioned matter before

Judge Michael F. Devine, held at the Fairfax County

Circuit Court, 4110 Chain Bridge Road, Fairfax,

Virginia 22030, before Christina S. Hotsko, RPR, of

Capital Reporting Company, beginning at approximately

10:43 a.m.

Capital Reporting Company
Fomenky vs. LXS 2005-7N Trust, et al.  05-29-2013

84

1    away all of its interest under this.

2           THE COURT:  Okay.

3           MR. RAMANA:  Okay.  But the borrower still

4    has its interest.  The party secured still has its

5    interest.  MERS has one of the sticks in the bundle

6    of sticks.

7           THE COURT:  With legal title.

8           MR. RAMANA:  Legal title with all the rights

9    that are afforded to that legal title.

10          THE COURT:  Right.  The question is, well,

11   what -- can it assign its legal title --

12          MR. RAMANA:  Yes.

13          THE COURT:  -- separate from the note and

14   then still have the right to enforce the note?

15          MR. RAMANA:  MERS has absolutely no interest

16   in receiving obligations under the note.

17          THE COURT:  I agree.

18          MR. RAMANA:  So when Mr. Brown says, well,

19   it's assigning the loan, no, no, no, no.  MERS will

20   tell you, it is not assigning the note, it is not

21   assigning anything to do with the debt itself.  It's

22   assigning its stick under the deed of trust.  Its

Exhibit H

**MERSCORP, INC.**
**RULES OF MEMBERSHIP**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| RULE 1 | MEMBERSHIP | Page 2 |
| RULE 2 | REGISTRATION ON THE MERS® SYSTEM | Page 8 |
| RULE 3 | OBLIGATIONS OF MERS | Page 15 |
| RULE 4 | RULE CHANGES | Page 18 |
| RULE 5 | FEES | Page 19 |
| RULE 6 | PROCEDURES | Page 22 |
| RULE 7 | DISCIPLINARY ACTIONS | Page 23 |
| RULE 8 | REQUIRED ASSIGNMENTS FOR FORECLOSURE & BANKRUPTCY | Page 25 |
| RULE 9 | USE AND OWNERSHIP OF INFORMATION | Page 28 |
| RULE 10 | INTERIM SECURITY INTERESTS | Page 31 |
| RULE 11 | SERVICES | Page 32 |
| RULE 12 | WARRANTIES | Page 33 |
| RULE 13 | INDEMNIFICATION | Page 37 |
| RULE 14 | NOTIFICATION TO MERS OF PENDING LAWSUITS | Page 39 |

## RULE 2

### REGISTRATION ON THE MERS® SYSTEM

*Section 1.*     MERS, in its sole discretion, shall determine the type and level of access to the MERS» System permitted to each Member and the types of transactions that such Member may register on the MERS» System.   No Member may register or attempt to register any transaction not authorized under the Rules of Membership or the Procedures.

*Section 2.*     Subject to Section 1 above, each Member may register any mortgage loan on the MERS» System in accordance with the Procedures.

*Section 3.*     Each Member shall promptly, or as soon as practicable, register on the MERS» System, in accordance with the Rules of Membership and the Procedures, any and all of the following transactions to which such Member is a party which involve a mortgage loan registered on the MERS» System until such time as the mortgage loan is deactivated from the MERS» System:

(a) the pledge of any mortgage loan or security interest therein and the corresponding release of such security interests;

(b) the pledge of any servicing rights or security interest therein and the corresponding release of such servicing rights or security interests;

(c) the transfer of beneficial ownership of a mortgage loan by a Member to a Member;

(d) the transfer of beneficial ownership of a mortgage loan by a non-Member to a Member;

(e) the transfer of beneficial ownership of a mortgage loan by a Member to a non-Member;

(f) the transfer of servicing rights with respect to a mortgage loan by a Member to a Member;

(g) the registration of servicing rights with respect to a mortgage loan from a non-Member to a Member;

(h) the transfer of servicing rights with respect to a mortgage loan from a Member to a non-Member (requiring deactivation);

(i) the initiation of foreclosure of any mortgage loan registered on the MERS® System;

(j) the release of a lien with respect to a mortgage loan registered on the MERS® System;

(k) the creation of a sub-servicing relationship with respect to a mortgage loan registered on the MERS® System; and

(l) any renewal, extension or modification of a mortgage loan registered on the MERS® System that involves the recording of a new security instrument and does not merely change the rate, principal balance or term.

Section 4.    (a)    The transfer to a non-Member of servicing rights with respect to a mortgage loan registered on the MERS® System shall require the deactivation of such mortgage loan from the MERS® System in accordance with these Rules and the Procedures. Upon the withdrawal or removal of a Member, all mortgage loans for which such Member acts as servicer shall be deactivated from the MERS® System, provided, however, that the mortgage loans shall remain registered with MERS if the substitute servicer is a Member and all MERS fees relating to the servicing transfer to the substitute servicer are paid. The transfer to a non-Member of a beneficial interest in a mortgage loan registered on the MERS® System shall not require the de-registration of such mortgage loan from the MERS® System and such transfer shall reflect the non-MERS member investor by using Organizational Identification Number (Org ID) 1000002 effective October 1, 2011. A deactivation is required if: (i) the servicer is a non-Member of MERS or (ii) such non-Member beneficial owner shall require deactivation.

(b)    As long as there are no contrary instructions, when the beneficial ownership of a mortgage loan registered on the MERS® System is vested in a non-Member, MERS and Mortgage Electronic Registration Systems, Inc. shall at all times comply with the instructions of the Member shown on the MERS® System as the servicer of such mortgage loan with respect to transactions relating to such mortgage loan. Such Member shall indemnify and hold harmless MERS, and any employee, director, officer or affiliate of MERS, for any and all liability incurred as a result of compliance by MERS with instructions given by such Member on behalf of the non-Member beneficial owner.

Section 5.    (a)    Each Member, at its own expense, shall cause Mortgage Electronic Registration Systems, Inc., to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. Mortgage Electronic Registration Systems, Inc. is a wholly owned subsidiary of MERS created for the purpose of serving as the mortgagee of record in the appropriate public records. The Member shall monitor the public records to verify that it has complied with the preceding sentence and shall maintain an adequate quality assurance program to ensure that its verification procedures are effective. The Member hereby warrants to MERS that either (i) an appropriate mortgage, or deed of trust, or other such instrument as may be required under applicable state law, naming Mortgage Electronic Registration Systems, Inc. as mortgagee, or (ii) an appropriate assignment of mortgage, or assignment of deed of trust, or other such instrument as may be required under applicable state law, naming Mortgage Electronic Registration Systems, Inc. as mortgagee, has been or as soon as practicable shall be, properly prepared and delivered to the appropriate

recording office and the Member shall promptly register on the MERS® System the date on which such instrument was delivered. As soon as practicable, the Member shall register on the MERS® System the specific recordation information provided by the custodian of public records which evidences that Mortgage Electronic Registration Systems, Inc. is mortgagee of record with respect to such mortgage loan. Upon the Member's becoming aware of any discrepancy between the information shown on the MERS® System and the information in the public records, the Member shall promptly correct the information on the MERS® System.

(b) At or prior to the time a Member registers a mortgage loan on the MERS® System, such Member shall provide evidence reasonably satisfactory to MERS demonstrating that Mortgage Electronic Registration Systems, Inc. is, or as soon as practicable shall be, properly recorded as mortgagee of record in the appropriate public records with respect to such mortgage loan.

(c) Mortgage Electronic Registration Systems, Inc. shall not act as mortgagee of record for the purpose of procuring borrowers for the Member or making mortgage loans on behalf of the Member.

(d) Reference herein to "mortgage(s)" shall include deed(s) of trust, and any other form of security instrument under applicable state law. References herein to "mortgagee of record" shall include the named beneficiary under a deed of trust in those jurisdictions where deeds of trust are used to secure loans, and any similar status as used in connection with any other form of security instrument under applicable state law.

vJuly2011                                    12

*Section 6.*     MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes.  In the absence of contrary instructions from the beneficial owner, MERS and Mortgage Electronic Registration Systems, Inc. may rely on instructions from the servicer shown on the MERS® System in accordance with these Rules and the Procedures with respect to transfers of beneficial ownership, transfers of servicing rights, and releases of security interests applicable to such mortgage loan.  The beneficial owner shall give any such contrary instructions to MERS and Mortgage Electronic Registration Systems, Inc. in writing and they may rely on such instructions until receipt of further written instructions from the beneficial owner.

*Section 7.*     Each Member shall review for accuracy and completeness all information shown on the MERS® System with respect to mortgage loans and related transactions registered by such Member, and promptly update any incorrect information.

*Section 8.*     Within ten (10) business days of receiving notice from the Member servicing the loan that the mortgage loan has been paid in full, MERS shall give notice to all Members shown on the MERS® System as having interests in such mortgage loan.  The Member servicing the mortgage loan shall be responsible, at its own expense, to:

          (a)   take, or cause to be taken, appropriate action, including delivery to the appropriate recording office of an instrument of satisfaction or release (which may be signed by a certifying officer of Mortgage Electronic Registration Systems, Inc.), to extinguish the lien of

such mortgage in the proper manner within the applicable state imposed time frames, and register on the MERS® System the date of such action, or

(b) notify MERS that, in fact, the mortgage loan has not been paid in full. If MERS is notified that a lien release has not been executed in compliance with applicable state imposed time frames, and the Member fails to take such action or give MERS notice that the mortgage loan has not been paid in full, then MERS reserves the right to release such mortgage. Such Member, upon demand, shall reimburse Mortgage Electronic Registration Systems, Inc. for its out-of-pocket costs in connection with release of the mortgage, including any penalties for failure to release the mortgage or take other action in a timely manner, and shall pay an administrative fee determined by Mortgage Electronic Registration Systems, Inc., and

(c) indemnify MERS and Mortgage Electronic Registration Systems, Inc. with respect to any liability which may arise as a result of the failure of such Member to take such action or give MERS such notice in a timely and accurate manner. Without limiting the generality of the foregoing, such indemnification shall extend to circumstances in which a mortgage is released by Mortgage Electronic Registration Systems, Inc., but the mortgage loan has not been paid in full, or in which such Member wrongfully refuses to authorize Mortgage Electronic Registration Systems, Inc. to release the mortgage.

## RULE 8

## REQUIRED ASSIGNMENTS FOR FORECLOSURE & BANKRUPTCY

*Section 1.* (a) With respect to each mortgage loan, which shall mean a loan secured by a mortgage, deed of trust or security deed (any such instrument is referred to herein as a "Security Instrument"), for which the note owner or the note owner's servicer has decided to: (i) initiate foreclosure proceedings, whether judicial or non-judicial or (ii) file a Proof of Claim or file a Motion for Relief from Stay in a bankruptcy ("Legal Proceedings"); and for which Mortgage Electronic Registration Systems, Inc. ( referred to herein as "MERS") is the mortgagee, beneficiary or grantee of record (as applicable), the note owner or the note owner's servicer shall cause a MERS Certifying Officer (also known as a "Signing Officer") to execute an assignment of the Security Instrument from MERS to the note owner's servicer, or to such other party expressly and specifically designated by the note owner. The Member agrees and acknowledges that MERS has the authority to execute such assignment of the Security Instrument in accordance with the immediately preceding sentence. The assignment of the Security Instrument must be executed, notarized, witnessed (if applicable) and be in recordable form and comply with all applicable laws, regulations and rules.

(b) The Member agrees and acknowledges that when MERS is identified as nominee (as a limited agent) of the note owner in the Security Instrument, MERS, as nominee, is the mortgagee, beneficiary, or grantee (as applicable), in the Security Instrument on behalf of and for the benefit of the note owner.

(c)     The Member servicing a mortgage loan registered on the MERS® System shall be responsible for processing foreclosures in accordance with the applicable agreements between such Member and the note owner and all applicable laws, regulations and rules.

(d)     The authority to initiate foreclosures and file Legal Proceedings in the name of MERS granted to a Member's Certifying Officers under such Member's MERS Corporate Resolution is revoked for actions initiated on or after July 22, 2011, the effective date of this Rule. (the "Effective Date"). Effective September 1, 2011, the Member whose Certifying Officer initiates a foreclosure in MERS' name could be sanctioned by MERS pursuant to Rule 7, provided however, if the Member voluntarily dismisses such foreclosure or withdraws the filed Legal Proceedings within 21 days of filing the action, no sanction shall be levied.

(e)(i) The note owner or the note owner's servicer shall cause the Certifying Officer to execute the assignment of the Security Instrument from MERS to the note owner's servicer, or to such other party expressly and specifically designated by the note-owner before initiating foreclosure proceedings or filing Legal Proceedings and promptly send the assignment of the Security Instrument (in recordable form) for recording in the applicable public land records.

(ii)     Notwithstanding subsection (e)(i), in states in which the law does not require the party initiating foreclosure proceedings or filing Legal Proceedings to also be the mortgagee, beneficiary, or grantee of record (as applicable), the note owner or the note owner's

servicer shall cause the Certifying Officer to execute the assignment of the Security Instrument from MERS to the note owner's servicer or to such other party expressly and specifically designated by the note-owner, either before or promptly after initiating foreclosure proceedings or filing any Legal Proceedings and promptly send the assignment of the Security Instrument (in recordable form) for recording in the applicable land records; provided, however, until MERS has identified and MERSCORP has published a list of states that do not require an executed assignment of the Security Instrument from MERS to the note owner's servicer, or to such other party expressly and specifically designated by the note owner before initiating foreclosure proceedings or filing Legal Proceedings, the note owner or the note-owner's servicer shall cause the Certifying Officer to execute the assignment from MERS to the note owner's servicer, or to such other party expressly and specifically designated by the note owner before initiating foreclosure or filing Legal Proceedings in all states.

# Exhibit I

## MERS Rules Details

Assignment from *MERS* to a member or non-member is not an option - p. 9 (c)(d) and (e).

MERS assignment is *to the owner* and does not *make one the owner*: p. 25, §1(a)(i)("whether judicial or non-judicial .. the note owner or servicer shall cause a MERS certifying officer .. to execute an assignment of the [DoT] (eg. Ex. D) to the note owner's servicer or other party designated by the note owner.").

MERS has no independent knowledge to confirm the accuracy of information on its system: p. 13, §7 – "Each Member shall review for accuracy .. all information on the MERS System with respect to mortgage loans and related transactions registered by such Member."

# Exhibit J



## Procedures Manual

Transitional
9/6/2011

# Transfer of Beneficial Rights

## Overview

Although the MERS[*] System tracks changes in ownership of the beneficial rights for loans registered on the MERS[*] System, the MERS[*] System cannot transfer the beneficial rights to the debt. The debt can only be transferred by properly endorsing the promissory note to the transferee. As a MERS[*] System Member you have two options for registering a transfer of beneficial rights to another Member: Option 1 and Option 2. The determination of whether Option 1 or Option 2 is used is based on the Membership Profile of the purchasing investor.

### Option 1



In an Option 1 transfer, the investor transfers beneficial rights on a system other than the MERS[*] System and that system then initiates the MERS[*] System transaction.

Loans in an Option 1 batch that have not been registered are automatically reprocessed ("cycled") until the loans have been registered, up to ten (10) calendar days from the Transfer Date. Option 1 investors receive notification when MIN cycling begins through the *Transfer of Beneficial Rights Reject Report.*

If you include MINs that are not registered in your agency transmission, you will receive an abbreviated version of the *Transfer of Beneficial Rights Reject Report* listing these unregistered MINs. It is your responsibility to register these MINs immediately, entering your MERS[*] System Org ID in the Investor field. If you register them after the 10 day cycling process is over, you must name the Agency in the Investor field.

An Option 1 Transfer of Beneficial Rights will replace any Option 2 investor on the loan. The investor that was removed during the Option 1 process is notified of its removal by the *Investor Removed by Option 1 TOB report.* Additionally, Interim Funder and Warehouse Gestation Lender interests are released automatically in an Option 1 beneficial rights transfer. No confirmations are required for Option 1 transfers.

If a MIN is included in an Option 1 and an Option 2 beneficial rights transfer batch at the same time, when the Option 1 beneficial rights transfer is completed, the duplicate MIN is deleted from the Option 2 beneficial rights transfer. The MINs that were deleted from the Option 2 beneficial rights transfer appear on the *MINs Deleted from Transfer of Beneficial Rights Report.* Non-duplicate MINs remain in the Option 2 transfer batch.

# Exhibit K




**FannieMae**

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892

*Announcement 06-24*                    *December 7, 2006*

*Amends these Guides:  Servicing*

*Process for Foreclosing on Mortgage Loans Reflecting
Mortgage Electronic Registration Systems, Inc. as Mortgagee*

This Announcement describes our new policy related to foreclosure actions for mortgages in
which Mortgage Electronic Registration Systems, Inc. ("MERS") is the mortgagee of record.
These changes are effective immediately for any foreclosure action initiated on or after
publication of this Announcement.

### Judicial Foreclosure

**Servicing Guide Part VIII, Section 105, Conduct of Foreclosure Proceedings**
Effective immediately, MERS must not be named as a plaintiff in any judicial action filed to
foreclose on a mortgage owned or securitized by Fannie Mae.  MERS is the mortgagee of
record when either a mortgage names MERS as the original mortgagee and is recorded in the
applicable land records, or a completed and recorded assignment names MERS as the
mortgage assignee.  Therefore, in most jurisdictions, the servicer will need to prepare a
mortgage assignment from MERS to the servicer, and then bring the foreclosure in its own
name, unless the Servicing Guide requires that the foreclosure be brought in the name of
Fannie Mae.  In that event, the assignment will need to be from MERS to Fannie Mae.

The assignment from MERS to the servicer should be in recordable form (*e.g.*, executed and
notarized) and, in some jurisdictions, it will need to be recorded.  In other jurisdictions, it
may be held by the servicer or the foreclosure attorney without being recorded.  Because the
assignment will be completed before the foreclosure begins (and recorded if required by
applicable law), MERS will no longer be the mortgagee.  Therefore, MERS should not be
named as a plaintiff in the foreclosure complaint or other judicial filings.

---

Announcement 06-24                                      Page 1

The servicer should consult its foreclosure attorney to determine the specific legal requirements of each jurisdiction in which it conducts judicial foreclosures of mortgage loans in which MERS is the mortgagee of record.

## Non-Judicial Foreclosure

In any non-judicial foreclosure proceedings, the servicer has the option of either assigning the mortgage from MERS to the servicer (in accordance with the process outlined above for judicial foreclosures), or proceeding with the foreclosure with MERS as the mortgagee of record.

If MERS remains the mortgagee of record, the servicer must ensure that the foreclosure attorney or trustee accurately identifies the status of MERS. MERS may never be identified as the "owner" or the "holder" of the Note or Security Instrument being foreclosed. MERS may be identified as the beneficiary of the deed of trust being foreclosed, but only if MERS is also identified as a nominee for the servicer, or as a nominee for Fannie Mae if our Servicing Guide requires the foreclosure to be brought in Fannie Mae's name.

The servicer should consult with its foreclosure attorney or trustee to determine the specific legal requirements of each jurisdiction in which it conducts non-judicial foreclosures of mortgages in which MERS is the mortgagee of record. Further, if MERS remains the mortgagee of record, then the servicer should also consult with its foreclosure attorney or trustee to determine the appropriate manner for identifying MERS' interest in the subject mortgage.

In any event, if an assignment has been recorded from MERS to either the servicer or Fannie Mae, and the borrower reinstates the mortgage prior to completion of the foreclosure proceedings, the servicer may choose to re-assign the mortgage to MERS and re-register the mortgage with MERS. Any such action will be at the discretion and expense of the servicer.

### Servicing Guide, Part VIII, Section 108.03, Other Reimbursable Expenses
Fannie Mae will not reimburse the servicer for any expense incurred in preparing or recording an assignment of the mortgage from MERS to the servicer or Fannie Mae, as applicable.

### Servicing Guide, Part VIII, Section 202.03, Foreclosure Conducted in MERS' Name
The provisions in Servicing Guide Part VIII, Section 202.03, addressing conveyance of properties when the foreclosure was conducted in the name of MERS, will continue to apply to any non-judicial foreclosure action completed in accordance with this Announcement and in which MERS remains the mortgagee of record.

*********

Servicers should contact their Portfolio Manager or Servicing Consultant if they have any questions about the information addressed in this Announcement.

Pamela S. Johnson
Senior Vice President

# Exhibit L

CWALT 2007-OA8 Sec Filings

http://www.sec.gov/cgi-bin/browse-edgar?company=2007-
OA8&match=contains&filenum=&State=&Country=&SIC=&myowner=exclude&action=getcompany

P&S Agreement

http://www.sec.gov/Archives/edgar/data/1399511/000090514807004941/efc7-1883_ex41.htm

CWALT, INC.,
Depositor
COUNTRYWIDE HOME LOANS, INC.,
Seller
PARK GRANADA LLC,
Seller
PARK MONACO INC.,
Seller
PARK SIENNA LLC,
Seller
COUNTRYWIDE HOME LOANS SERVICING LP.
Master Servicer
and
THE BANK OF NEW YORK,
Trustee

POOLING AND SERVICING AGREEMENT
Dated as of June 1, 2007

ALTERNATIVE LOAN TRUST 2007-OA8

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA8

ARTICLE I

DEFINITIONS

SECTION 1.01.        Defined Terms.

Closing Date: June 28, 2007.

ARTICLE II
CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

SECTION 2.01   Conveyance of Mortgage Loans

(a)     Each Seller, concurrently with the execution and delivery of this Agreement, hereby sells,
transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, all its respective right, title
and interest in and to the related Mortgage Loans, including all interest and principal received or receivable by such

Seller, on or with respect to the applicable Mortgage Loans after the Cut-off Date and all interest and principal payments on the related Mortgage Loans received prior to the Cut-off Date in respect of installments of interest and principal due thereafter, but not including payments of principal and interest due and payable on such Mortgage Loans on or before the Cut-off Date.  On or prior to the Closing Date, Countrywide shall deliver to the Depositor or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File for each Mortgage Loan listed in the Mortgage Loan Schedule (except that, in the case of the Delay Delivery Mortgage Loans (which may include Countrywide Mortgage Loans, Park Granada Mortgage Loans, Park Monaco Mortgage Loans or Park Sienna Mortgage Loans), such delivery may take place within thirty (30) days following the Closing Date.  Such delivery of the Mortgage Files shall be made against payment by the Depositor of the purchase price, previously agreed to by the Sellers and Depositor, for the Mortgage Loans.  With respect to any Mortgage Loan that does not have a first payment date on or before the Due Date in the month of the first Distribution Date, Countrywide shall deposit into the Distribution Account on or before the Distribution Account Deposit Date relating to the first Distribution Date, an amount equal to one month's interest at the related Adjusted Mortgage Rate on the Cut-off Date Principal Balance of such Mortgage Loan.

(b)     Immediately upon the conveyance of the Mortgage Loans referred to in clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund together with the Depositor's right to require each Seller to cure any breach of a representation or warranty made in this Agreement by such Seller or to repurchase or substitute for any affected Mortgage Loan in accordance herewith.

(c)     In connection with the transfer and assignment set forth in clause (b) above, the Depositor has delivered or caused to be delivered to the Trustee (or, in the case of the Delay Delivery Mortgage Loans, will deliver or cause to be delivered to the Trustee within thirty (30) days following the Closing Date) for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i)     (A) the original Mortgage Note endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse," with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note); or

38

(B)     with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note;

(ii)     except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, the original recorded Mortgage or a copy of such Mortgage certified by Countrywide as being a true and complete copy of the Mortgage (or, in the case of a Mortgage for which the related Mortgaged Property is located in the Commonwealth of Puerto Rico, a true copy of the Mortgage certified as such by the applicable notary) and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loans and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

(iii)     in the case of each Mortgage Loan that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage (which may be included in a blanket assignment or assignments), together with, except as provided below, all interim recorded assignments of such mortgage (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates); provided that, if the related Mortgage has not been returned from the applicable public recording office, such assignment of the Mortgage may exclude the information to be

provided by the recording office; provided, further, that such assignment of Mortgage need not be delivered in the case of a Mortgage for which the related Mortgaged Property is located in the Commonwealth of Puerto Rico;

(iv)     the original or copies of each assumption, modification, written assurance or substitution agreement, if any;

(v)     except as provided below, the original or duplicate original of the lender's title policy or a printout of the electronic equivalent and all riders thereto; and

(vi)     in the case of a Cooperative Loan, the originals of the following documents or instruments:

(A)     The Coop Shares, together with a stock power in blank;

(B)     The executed Security Agreement;

(C)     The executed Proprietary Lease;

(D)     The executed Recognition Agreement;

(E)     The executed UCC-1 financing statement with evidence of recording thereon which have been filed in all places required to perfect the applicable Seller's interest in the Coop Shares and the Proprietary Lease; and

39

(F)     The executed UCC-3 financing statements or other appropriate UCC financing statements required by state law, evidencing a complete and unbroken line from the mortgagee to the Trustee with evidence of recording thereon (or in a form suitable for recordation).

In addition, in connection with the assignment of any MERS Mortgage Loan, each Seller agrees that it will cause, at the Trustee's expense, the MERS® System to indicate that the Mortgage Loans sold by such Seller to the Depositor have been assigned by that Seller to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files the information required by the MERS® System to identify the series of the Certificates issued in connection with such Mortgage Loans. Each Seller further agrees that it will not, and will not permit the Master Servicer to, and the Master Servicer agrees that it will not, alter the information referenced in this paragraph with respect to any Mortgage Loan sold by such Seller to the Depositor during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

In the event that in connection with any Mortgage Loan that is not a MERS Mortgage Loan the Depositor cannot deliver (a) the original recorded Mortgage, (b) all interim recorded assignments or (c) the lender's title policy (together with all riders thereto) satisfying the requirements of clause (ii), (iii) or (v) above, respectively, concurrently with the execution and delivery of this Agreement because such document or documents have not been returned from the applicable public recording office in the case of clause (ii) or (iii) above, or because the title policy has not been delivered to either the Master Servicer or the Depositor by the applicable title insurer in the case of clause (v) above, the Depositor shall promptly deliver to the Trustee, in the case of clause (ii) or (iii) above, such original Mortgage or such interim assignment, as the case may be, with evidence of recording indicated thereon upon receipt thereof from the public recording office, or a copy thereof, certified, if appropriate, by the relevant recording office, but in no event shall any such delivery of the original Mortgage and each such interim assignment or a copy thereof, certified, if appropriate, by the relevant recording office, be made later than one year following the Closing Date, or, in the case of clause (v) above, no later than 120 days following the Closing Date; provided, however, in the event the Depositor is unable to deliver by such date each Mortgage and each such interim

assignment by reason of the fact that any such documents have not been returned by the appropriate recording office, or, in the case of each such interim assignment, because the related Mortgage has not been returned by the appropriate recording office, the Depositor shall deliver such documents to the Trustee as promptly as possible upon receipt thereof and, in any event, within 720 days following the Closing Date. The Depositor shall forward or cause to be forwarded to the Trustee (a) from time to time additional original documents evidencing an assumption or modification of a Mortgage Loan and (b) any other documents required to be delivered by the Depositor or the Master Servicer to the Trustee. In the event that the original Mortgage is not delivered and in connection with the payment in full of the related Mortgage Loan and the public recording office requires the presentation of a "lost instruments affidavit and Indemnity" or any equivalent document, because only a copy of the Mortgage can be delivered with the instrument of satisfaction or reconveyance, the Master Servicer shall execute and deliver or cause to be executed and delivered such a document to the public recording office. In the case where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, Countrywide shall deliver to the Trustee a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage.

40

As promptly as practicable subsequent to such transfer and assignment, and in any event, within one-hundred twenty (120) days after such transfer and assignment, the Trustee shall (A) as the assignee thereof, affix the following language to each assignment of Mortgage: "CWALT, Inc., Series 2007-OA8, The Bank of New York, as trustee", (B) cause such assignment to be in proper form for recording in the appropriate public office for real property records and (C) cause to be delivered for recording in the appropriate public office for real property records the assignments of the Mortgages to the Trustee, except that, (i) with respect to any assignments of Mortgage as to which the Trustee has not received the information required to prepare such assignment in recordable form, the Trustee's obligation to do so and to deliver the same for such recording shall be as soon as practicable after receipt of such information and in any event within thirty (30) days after receipt thereof and (ii) the Trustee need not cause to be recorded any assignment which relates to a Mortgage Loan, the Mortgaged Property and Mortgage File relating to which are located in any jurisdiction (including Puerto Rico) under the laws of which the recordation of such assignment is not necessary to protect the Trustee's and the Certificateholders' interest in the related Mortgage Loan as evidenced by an opinion of counsel delivered by Countrywide to the Trustee within 90 days of the Closing Date (which opinion may be in the form of a "survey" opinion and is not required to be delivered by counsel admitted to practice law in the jurisdiction as to which such legal opinion applies).

SECTION 10.03.   Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

SECTION 10.04.   Intention of Parties.

(a)       It is the express intent of the parties hereto that the conveyance of the (i) of the Mortgage Loans by the Sellers to the Depositor and (ii) Trust Fund by the Depositor to the Trustee each be, and be construed as, an absolute sale thereof to the Trustee. It is, further, not the intention of the parties that such conveyances be deemed a pledge thereof. However, in the event that, notwithstanding the intent of the parties, such assets are held to be the property of any Seller or the Depositor, as the case may be, or if for any other reason this Agreement is held or deemed to create a security interest in either such assets, then (i) this Agreement shall be deemed to be a security agreement (within the meaning of the Uniform Commercial Code of the State of New York) with respect to all such

assets and security interests and (ii) the conveyances provided for in this Agreement shall be deemed to be an assignment and a grant pursuant to the terms of this Agreement (i) by each Seller to the Depositor or (ii) by the Depositor to the Trustee, for the benefit of the Certificateholders, of a security interest in all of the assets that constitute the Trust Fund, whether now owned or hereafter acquired.

Each Seller and the Depositor for the benefit of the Certificateholders shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Trust Fund, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement. The Depositor shall arrange for filing any Uniform Commercial Code continuation statements in connection with any security interest granted or assigned to the Trustee for the benefit of the Certificateholders.

(b)     The Depositor hereby represents that:

(i)     This Agreement creates a valid and continuing security interest (as defined in the Uniform Commercial Code as enacted in the State of New York (the "NY UCC")) in the Mortgage Notes in favor of the Trustee, which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Depositor.

(ii)    The Mortgage Notes constitutes "instruments" within the meaning of the NY UCC.

(iii)   Immediately prior to the assignment of each Mortgage Loan to the Trustee, the Depositor owns and has good and marketable title to such Mortgage Loan free and clear of any lien, claim or encumbrance of any Person.

110

(iv)    The Depositor has received all consents and approvals required by the terms of the Mortgage Loans to the sale of the Mortgage Loans hereunder to the Trustee.

(v)     All original executed copies of each Mortgage Note that are required to be delivered to the Trustee pursuant to Section 2.01 have been delivered to the Trustee.

**VIRGINIA:**

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

ORVILLE CAIN
18392 Fairway Oaks Square
Leesburg, VA 20176

                Plaintiff,

v.

FFC PROPERTIES, LLC
17090 Quail Creek Circle
Hamilton, VA 20158

                Defendant.

At Civil Case No.: <u>CL00099182-00</u>



### <u>DEFENDANT FFC PROPERTIES, LLC'S DEMURRER TO PLAINTIFF'S COMPLAINT</u>

COMES NOW the Defendant, **FFC PROPERTIES, LLC** ("FFC"), by and through counsel, and files this Demurrer to Plaintiff's Complaint and states as follows:

1. FFC demurs to Counts I, IV, V, VI, and IX of Plaintiff's Complaint as they fail to state any cause of action against FFC personally. Specifically, the actions are pled against all five co-defendants without distinction as to who did what. Such allegations are conclusory and insufficient.

2. FFC demurs to Count I of Plaintiff's Complaint for failure to state a cause of action for breach of contract against FFC. Specifically, Plaintiff fails to plead a legal obligation of FFC to Plaintiff.

3. FFC demurs to Count IV of Plaintiff's Complaint for failure to state a cause of action for Breach of Duty of Good Faith and Fair Dealing. Specifically, Virginia law does not

-1-

recognize Count IV as a separate cause of action in tort from Plaintiff's Count I breach of contract claim and, therefore, Plaintiff duplicates Count I with Count IV.

4.      FFC demurs to Count V of Plaintiff's Complaint for failure to state a cause of action for abuse of process against FFC. Specifically, Plaintiff neither pleads the existence of an ulterior purpose by FFC nor pleads an improper act in the use of the foreclosure process by FFC.

5.      FFC demurs to Count VI of Plaintiff's Complaint for failure to state a cause of action for slander of title against FFC. Specifically, Plaintiff fails to plead that FFC published a false statement with the intent to result in Plaintiff's harm to his property rights in land.

6.      FFC demurs to Count IX of Plaintiff's Complaint for failure to state a cause of action for rescission of the foreclosure sale against FFC. Specifically, rescission is not an applicable remedy in this context and Plaintiff fails to plead any exception.

7.      FFC will file a memorandum in support of its Demurrer to Plaintiff's Complaint after argument is scheduled.

**WHEREFORE**, these premises considered, FFC Properties, LLC prays this Court to sustain this Demurrer and dismiss Plaintiff's claims against FFC Properties, LLC and for such further and other relief as to the Court may seem just and meet.

FFC PROPERTIES, LLC
By Counsel

Respectfully submitted,

STEPHEN K. CHRISTENSON P.C.

By: _____
Jeremy D. Camacho, VSB #86765
4160 Chain Bridge Road
Fairfax, VA 22030
(703) 591-3445
(703) 591-5787 Facsimile

-2-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Defendant FFC Properties, LLC's Demurrer was mailed by first-class mail, postage prepaid this 17ᵗʰ day of February 2016 to:

Christopher E. Brown,
526 King Street, Suite 207
Alexandria, VA 22314
*Counsel for Plaintiff*

The Bank of New York Mellon
101 Barclay St.
New York, NY 10286
*Co-Defendant*

New Penn Financial, LLC
c/o Corporation Service Co.
1111 East Main Street
Richmond, VA 23219
*Co-Defendant*

Resurgent Capital Services, LP
c/o Corporation Service Co.
1111 East Main Street
Richmond, VA 23219
*Co-Defendant*

Samuel I. White, PC
5040 Corporate Woods Boulevard, Suite 120
Virginia Beach, VA 23462
*Co-Defendant*

Jeremy D. Camacho

RONALD J. GUILLOT, JR.
(757) 217-9304 Direct Dial
(757) 337-2814 Facsimile
rguillot@siwpc.com

# SAMUEL I. WHITE, P.C.
### ATTORNEYS AND COUNSELORS AT LAW

5040 Corporate Woods Drive
Suite 120
Virginia Beach, VA 23462
(757) 490-9284 Telephone
www.siwpc.net

February 23, 2016

Circuit Court Of Loudoun County
Attention: Clerk of Circuit Court- Civil Division
P. O. Box 550
18 E. Market St.
Leesburg, VA 20178

Re:   *Orville Cain v The Bank of New York Mellon, et al.*
Civil Action File No.: CL99182

Dear Sir or Madam:

Enclosed please find one original and one copy of the following Demurrer with regard to the above-referenced case. Please file the original with the Court in your usual manner and send a stamped filed copy to our office. I have enclosed a self-addressed stamped envelope for your convenience.

Thank you for your time and assistance in this matter. If you should have any questions or need anything in the interim, please feel free to contact me at 757-490-9284 ext 2215.

Very truly yours,

Emily C. Badger
Legal Assistant

Enclosures
Cc.   Rocco DeLeonardis, Esq.
Christopher Brown, Esq.
The Bank of New York Mellon
New Penn Financial, LLC
Resurgent Capital Services, LP
Jeremy Camacho, Esq.

VIRGINIA:     IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

| | | |
|---|---|---|
| ORVILLE CAIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CL99182 |
| v. | ) | |
| | ) | |
| THE BANK OF NEW YORK MELLON, | ) | |
| ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

## DEMURRER

COMES NOW Defendant Samuel I. White, P.C. ("SIWPC"), by counsel, and for its Demurrer to the Complaint of the Plaintiff Orville Cain ("Plaintiff"), state the following.

Pursuant to Rule 4:15 (c) of the Virginia Supreme Court, SIWPC reserves the right to file a brief in support of this Demurrer at the appropriate time.

## I.   STANDARD OF REVIEW

Under well-established principles, "a demurrer tests the legal sufficiency of facts alleged in pleadings." *Abi-Najm v. Concord Condominium, LLC*, 280 Va. 350, 356-57 (2010). "In order to survive demurrer, a complaint must allege sufficient facts to constitute foundation in law for the judgment sought, and not merely conclusions of law. *Hubbard v. Dresser, Inc.*, 271 Va. 117, 122-23, (2006).

"A demurrer admits the truth of the facts contained in the pleading to which it is addressed, as well as any facts that may be reasonably and fairly implied and inferred from those allegations. A demurrer does not, however, admit the correctness of the pleader's conclusions of law." *Evans v. Evans*, 280 Va. 76, 81 (2010).

1

## II.   DEMURRER TO COMPLAINT IN ITS ENTIRETY: PLAINTIFF LACKS STANDING TO CHALLENGE THE VALIDITY OF THE APPOINTMENT INSTRUMENT

In Virginia, "a party has standing if it can show an immediate, pecuniary, and substantial interest in the litigation, and not a remote or indirect interest." *Livingston v. Va. DOT*, 284 Va. 140, 154 (2012)(internal quotation marks and citations omitted). The question to ask when determining standing is if the party "has a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed." *Id.*

When a demurrer concerns the issue of standing, the demurrer will be sustained if the plaintiff's "factual allegations fails to show that it actually has a 'substantial legal right' to assert." *Deerfield v. City of Hampton*, 283 Va. 759, 764 (2012)(internal quotation marks and citations omitted). Moreover, Virginia law holds that only the parties to an agreement have standing to challenge the agreement. *Cemetery Consultants, Inc. v. Tidewater Funeral Dirs. Ass'n.*, 219 Va. 1001, 1003 (1979).

In this case, Plaintiff lacks standing to challenge the appointment of Samuel I. White, P.C. as substitute trustee because Plaintiff was not a party to the agreement appointing the substitute trustee, nor did his obligations and duties change due to the execution of the agreement. *See Bennett v. Bank of Am., N.A.*, No: 3:12CV34-HEH, 2012 U.S. Dist. LEXIS 54725, at *20-21 (E.D. Va. April 18, 2012); *Pham v. Bank of N.Y.*, 856 F. Supp. 2d 804, 811 n.6 (E.D. Va. July 30, 2012). Therefore, Plaintiff lacks standing to maintain claims arising from the execution of the instrument appointing Samuel I. White, P.C. as substitute trustee and Plaintiff's Complaint should be dismissed with prejudice.

2

### III.    DEMURRER TO THE INDIVIDUAL COUNTS INT THE COMPLAINT

The Plaintiff's Complaint is short on factual allegations and chocked full of recitations of outdate and rejected legal theories.  The Plaintiff attacks the non-judicial foreclosure scheme set out by the Virginia's legislature but alleges no facts sufficient to attack this foreclosure.  In fact, the Plaintiff does not allege that he was current on his loan obligations.  He does not allege that he had sufficient funds to pay the mortgage or its arrears.  The Plaintiff fails to set forth facts sufficient to support any cause of action against this defendant and his Complaint should be dismissed.

### A. Complaint Fails to State a Cause of Action for Breach of Contract.

In Count I of the Complaint the Plaintiff throws several theories against the wall in the hopes one will stick.  However the Plaintiff fails to allege the necessary elements for a breach of contract against SIWPC as such, this count should be dismissed as a matter of law.  "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA,* 770 S.E.2d 491, 493, 494 (Va. 2015) (citing), *Filak v. George,* 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004); see also *Covarrubias v. CitiMortgage, Inc.* 2014 WL 6968035 (E.D. Va. J. J.A. Gibney) 3:14-cv-157 (Richmond Division).  SIWPC as Trustee, only owes those duties enumerated in the Deed of Trust as well as Virginia Code 55-59.  The Plaintiff has not alleged any breach of contract as pertaining to SIWPC.

3

**B. Complaint Fails to State a Cause of Action for Fraud**

Count II of the Complaint fails to state a claim for actual fraud because the Plaintiffs have failed to plead the necessary elements of a fraud claim with the detail required by Virginia law. Virginia law requires fraud to be pleaded with particularity. *Ward's Equipment, Inc. v. New Holland North America, Inc.*, 254 Va. 343, 348, 485 S.E.2d 137, 139 (1997). Each element of fraud must be proven by "clear, cogent and convincing" evidence. *Blair Constr. Inc. v Weatherford*, 253 Va. 343, 348, 485 S.E.2d 778, 783 (1978). To establish a fraud claim, the plaintiff must allege with specificity: 1) a false representation; 2) of a material fact; 3) made intentionally and knowingly; 4) with the intent to mislead; 5) reliance by the party misled; and 6) resulting damage to the party misled. *Van Deusen v. Snead*, 247 Va. 324, 441 S.E.2d 207 (1994). "A party alleging fraud must aver the misrepresentation of a present or preexisting fact. *See Blair Constr. v. Weatherford*, 253 Va. 343, 348, 485 S.E.2d 137, 140 (1997). Fraud cannot be predicated on unfulfilled promises or statements as to future events. *See Mayberry v. Emessay, Inc.*, 201 F. Supp 2d. 687, 698 (W.D. Va. 2002).

Plaintiffs have failed to allege facts sufficient to establish an actual fraud claim under applicable Virginia law. Plaintiffs have failed to plead the essential elements for a fraud claim including the "who, what, when, where and how" of the misrepresentations that were made to Plaintiffs. Additionally, Plaintiffs have failed to allege sufficient factual support for their allegations that the statements allegedly made by SIWPC were intentionally made with the actual intent to deceive the Plaintiffs, and that the Plaintiffs relied on such representations. Furthermore, the Plaintiffs have not pled that they have actual damages resulting from such alleged fraud that would entitle them to compensatory damages. For the foregoing reasons, SIWPC requests that this Court dismiss Plaintiff's claim for fraud with prejudice. SIWPC, as

4

Trustee, only owes those duties enumerated in the Deed of Trust as well as Virginia Code 55-59. The Plaintiff has not alleged any fraud as pertaining to SIWPC.

### C. Complaint Fails to State a Cause of Action for a Violation of the Virginia Consumer Protection Act and Virginia Code

Count III of the Complaint fails to state a cause of action against SIWPC as a Trustee under the Deed of Trust. Plaintiffs fail to allege that SIWPC is a "supplier" under the VCPA. "Supplier" means a seller, lessor or licensor who advertises, solicits or engages in consumer transactions, or a manufacturer, distributor or licensor who advertises and sells, leases or licenses goods or services to be resold, leased or sublicensed by other persons in consumer transactions. Va. Code § 59.1-198. Plaintiffs fail to allege any facts that would give rise to this presumption.

Further, Plaintiffs fail to allege that SIWPC was in any way engaged in a "consumer transaction" under the VCPA. SIWPC's involvement in this matter does not fit into any of the provisions as explicated in this subsection. Plaintiffs' only allegations are recitations of other causes of actions alleged herein and fail to allege facts sufficient to even bring the Trustee's actions within the purview of the VCPA.     These are merely naked allegations wholly unsupported by the facts in the Complaint.

The VCPA specifically provides it does not apply to any aspect of a consumer transaction which aspect is authorized under laws or regulations of this Commonwealth or the United States, or the formal advisory opinions of any regulatory body or official of this Commonwealth or the United States. Trustees and substitute trustees under a deed of trust are provided for in Virginia Code § 55-59 et seq. In addition, the VCPA does not apply to "[t]hose aspects of a consumer transaction which are regulated by the Federal Consumer Credit Protection Act." Va. Code § 59.1-199(c); *see also Graham v. RRR, LLC*, 202 F.Supp.2d 483, 490 (E.D. Va. 2002). It is presumed that unless Congress has clearly manifested an intention to totally regulate an area of

law, there is no pre-emption of state law. *Cipollone v. Liggett Group*, 505 U.S. 504, 516 (1992). "In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law or if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" Id. (citations omitted).

In *McFadden v. Federal National Mortgage Association*, the United States Fourth Circuit Court of Appeals addressed the applicability of the VCPA to a Trustee under a Deed of Trust in an exact set of facts as the case at bar and found that SIWPC [acting as Trustee] was exempt from the provisions of the VCPA. *See McFadden*, 525 Fed. Appx. 223, 2013 WL 2151199 (C.A.4 (W.Va.)) . "Finally, we hold that the McFaddens lacked any possibility of prevailing on their VCPA claim against White, P.C., which was the sole defendant named in this claim. In the VCPA claim, the McFaddens alleged that under Virginia Code Section 59.1–198, White, P.C. was a "supplier," and that the loan and related foreclosure sale were "part" of a "consumer transaction." Id. The Court held that the VCPA was inapplicable stating:

> First, the VCPA is inapplicable to any "aspect of a consumer transaction" that is "authorized" under Virginia law. Va.Code § 59.1–199(A). As we already have stated in our above discussion of the McFaddens' quiet title claim, the appointment of substitute trustees and the process for such appointments is set forth in Virginia Code Section 55–59(9), which authorizes the party secured by the deed of trust or the holder of more than fifty percent of the obligations secured thereby to appoint a substitute trustee. Id. As we further explained above, the appointment of White, P.C. as substitute trustee under the deed of trust met the requirements of Virginia law. See id.

The Court correctly noted that the VCPA was inapplicable because Virginia Code authorizes and sets forth the requirements regarding Trustees under a Deed of Trust.

Here, SIWPC is only required to comply with the terms of the Deed of Trust and Virginia Code. *See Horvath v. Bank of New York*, 2010 U.S. Dist. LEXIS 19965, *3 (E.D. Va. January 29, 2010) (holding that "a trustee under a deed of trust has no duty of diligence, and trustees only

owe those duties that are listed in the Deed of Trust"). Plaintiffs have failed to allege any violation under the Deed of Trust or the Virginia Code.

### D. Breach of duty of Good Faith and Fair Dealing

The Plaintiff fails to allege the necessary elements for a breach of duty of good faith and fair dealing; as such, this count should be dismissed as a matter of law. Virginia law does not recognize an independent cause of action for breach of an implied covenant of good faith and fair dealing. Claims of this nature have been limited to those situations where a contract allows for the exercise of discretion in performing a contractual duty. The Plaintiffs do not cite to any contractual provisions that were breached much less any provision which allows the exercise of discretion on the part of the Trustee. The duties of a trustee under a Deed of Trust are limited and defined by the instrument under which that trustee acts. *See Powell*, supra. SIWPC, as trustee, only owes those duties enumerated in the Deed of Trust as well as Virginia Code 55-59. The Plaintiff has not alleged any breach of duty of good faith and fair dealing as pertaining to SIWPC.

### E. Abuse of Process

The Plaintiff fails to allege the necessary elements for abuse of process; as such, this count should be dismissed as a matter of law. SIWPC, as trustee, only owes those duties enumerated in the Deed of Trust as well as Virginia Code 55-59. The Plaintiff has not alleged any abuse of process as pertaining to SIWPC. There are only two sources of duties and obligations to which substitute trustees, like SIWPC herein, are held in mortgage transactions. Those two sources of duties for substitute trustees are the Deed of Trust and *The Code of Virginia*. *See Horvath v. Bank of New York*, 2010 U.S. Dist. LEXIS 19965, *3 (E.D. Va.

7

January 29, 2010) (holding that "a trustee under a deed of trust has no duty of diligence, and trustees only owe those duties that are listed in the Deed of Trust"). In the Complaint, Plaintiffs have failed to allege any violation under the Deed of Trust or *The Code of Virginia* on the part of SIWPC. There is not a single contractual provision recited in the Complaint from the Deed of Trust, purportedly forming the basis of any obligation, duty, or responsibility on the part of SIWPC. Likewise, there is no provision of *The Code of Virginia* in Section 55-59.1, *et seq.*, or otherwise, cited as establishing the legal basis for any obligation or duty, or even a breach or violation of same, on the part of SIWPC.

### F. Slander of Title

The Plaintiff fails to allege the necessary elements for slander of title; as such, this count should be dismissed as a matter of law. SIWPC, as trustee, only owes those duties enumerated in the Deed of Trust as well as Virginia Code 55-59. The Plaintiff has not alleged any slander of title as pertaining to SIWPC. Any documents that were filed in the land records, while it is denied that they were false, were mandated by the Deed of Trust and Virginia Code 55-59 *et seq.*

### G. Violation of FDCPA

The Plaintiff fails to allege any factual support that this defendant's actions rise to a violation of the FDCPA. The Plaintiff's naked assertions are not a sufficient substitution for factual allegations and do not support any violation of FDCPA as pertaining to SIWPC.

### H. Virginia Civil Conspiracy

The Plaintiff recycles an alleged breach of contract claim under the guise of a civil conspiracy claim in Count VIII. Plaintiff fails to allege the necessary elements for Virginia civil

8

conspiracy; as such, this count should be dismissed as a matter of law. SIWPC, as trustee, only owes those duties enumerated in the Deed of Trust as well as Virginia Code 55-59. The Plaintiff has not alleged any civil conspiracy as pertaining to SIWPC.

## I.  Equitable Rescission

Count IX of the Complaint fails to state a cause of action.  In fact, Count IX is really a prayer for relief, but one that fails in any event.  The extraordinary equitable relief of an equitable rescission remedy is unavailable post-foreclosure because the only available remedy, if any, at such juncture is legal damages.  The Court in *Mathews* stated that … "the borrower is the only party with standing to bring an action, whether for damages after the fact of the improper sale or to bar the improper sale in equity before it occurs." *Mathews* at 731, n.1(internal citations omitted).  Applying *Mathews*, two separate Circuit Courts upheld the maxim that damages were appropriate post-foreclosure while equitable remedies may be appropriate pre-foreclosure.

This general prohibition of post-foreclosure rescission has also been applied in Declaratory Judgment actions wherein plaintiffs similarly situated to the Plaintiff here have sought Courts to declare that the Deed of Foreclosure was invalid due to some alleged infirmity of the foreclosure sale.  "Where claims and rights asserted have fully matured, and the alleged wrongs have already been suffered, a declaratory judgment proceeding, which is intended to permit the declaration of rights before they mature, is not an available remedy." *Board of Supervisors v. Hylton Enters.*, 216 Va. 582, 585, 221 S.E.2d 534, 537 (Va. 1976).; *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle County Bd. of Sup'rs* 285 Va. 87, 99, 737 S.E.2d 1, 7 (Va. 2013).  The Eastern District of Virginia, applying Virginia law, has consistently applied this approach.  *See Pazmino v. LaSalle Bank*, No. 1:09cv1173, 2010 WL

9

2039163, at *1 (E.D. Va. May 20, 2010); *Tapia v. U.S. Bank*, No. 1:09cv1025, 2010 WL 2521374, at *2 (E.D. Va. June 22, 2010); *Schafer v. Citibank, N.A.*, 1:10-CV-10 GBL, 2010 WL 9034653 (E.D. Va. Aug 3, 2010) aff'd 447 F. App'x (4th Cir. 2011). In each case, the court rejected Plaintiffs' requests for declaratory judgments as untimely and inappropriate because the foreclosure, and thus the wrong, had already occurred. *See Pazmino* at *4; Tapia at *5.

WHEREFORE Defendant Samuel I. White, P.C. hereby prays that its Demurrer be sustained and that the Complaint be dismissed in its entirety with prejudice and without leave to amend, and such other and further relief as this Court may deem appropriate.

SAMUEL I. WHITE, P.C.

By: _____
                              Counsel

Ronald J. Guillot, Jr. (VSB No. 72153)
Samuel I. White, P.C.
5040 Corporate Woods Drive, Ste. 120
Virginia Beach, Virginia 23462
Telephone No.: (757) 217-9304
Facsimile No.: (757) 337-2814
rguillot@siwpc.com
*Counsel for Defendant Samuel I. White, P.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on **February 23, 2016**, I electronically filed the foregoing paper with

the Clerk of the Court using the ECF system.  In addition, I served the foregoing paper via U.S.

Mail to:

Rocco DeLeonardis, Esq.                         Jeremy D. Camacho, Esq.
VIRGINIA LAW, PLC                               STEPHEN K. CHRISTENSON, P.C.
11480 Sunset Hills Rd., Suite 120E              4160 Chain Bridge Road
Reston, Virginia  20190                         Fairfax, VA 22030


Christopher E. Brown, Esq.
526 King Street, Suite 207
Alexandria, Virginia 22314


THE BANK OF NEW YORK MELLON FKA
THE BANK OF NEW YORK,
101 Barclay St – 4W
New York, NY 10286
SERVE: Private Process

New Penn Financial, LLC
DBA Shellpoint Mortgage Servicing
Serve Registered Agent:
Corporation Service Company
1111 East Main Street
Richmond, Virginia 23219

Resurgent Capital Services, LP
Serve Registered Agent:
Corporation Service Company
1111 East Main Street
Richmond, VA 23219

Ronald J. Guillot, Jr.

ii